### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 1:18-cr-00033-01-JL** |
| | ) | |
| **SERGIO MARTINEZ,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### GOVERNMENT'S MEMORANDUM IN OPPOSITION
### TO DEFENDANT SERGIO MARTINEZ'S MOTION TO SUPPRESS WIRETAP

Defendant Sergio Martinez filed a motion to suppress evidence obtained from court-authorized wiretaps. Because the defendant cannot establish that the issuing court erred in granting the government's request for a wiretap, the defendant's motion should be denied without a hearing.

### BACKGROUND

Defendant Sergio Martinez and thirty-three other individuals are charged with conspiracy to distribute, and possess with intent to distribute, controlled substances, in violation of 21 U.S.C. § 846. Sergio Martinez is also charged with possession of a firearm in furtherance of a drug trafficking crime, money laundering, and distribution of controlled substances resulting in death.

Some of the government's evidence in this case was obtained pursuant to wiretaps on Sergio Martinez's cellular telephones. Each application was approved by United States District Judge Landya B. McCafferty and was supported by a lengthy affidavit executed by Michael Molloy, a Task Force Officer ("TFO") of the Drug Enforcement Administration ("DEA"). Each affidavit identified the targets of the investigation, discussed the evidence obtained in the investigation, described the use of various telephones associated with the targets of the

investigation, and most importantly for purposes of the pending motion, described other investigative methods that law enforcement officers had used or considered as part of the investigation.

In his initial 97-page affidavit (the focus of the defendant's motion), TFO Molloy described the status of the investigation. He explained how it began with an overdose death in March of 2017 after the deceased used fentanyl purchased from "Brian," a source of supply in Lawrence, Massachusetts. The early investigation led to the identification of various telephone numbers used by multiple customers who ordered fentanyl from a supplier they all referred to as "Brian." Investigators used information from customers and received search warrants to collect location information from those "customer phones" and identified a suspected "base of operations" where those phones were answered. Confidential sources were used to make controlled purchases of drugs from the "Brian" drug trafficking organization ("DTO"). Every controlled purchase involved a different distributor and confidential sources reported that even over many purchases, they rarely met the same distributor twice. On one occasion, officers arrested a distributor after he sold over 500 grams of fentanyl to an undercover officer. That distributor refused to cooperate and the DTO continued to operate, unaffected by the seizure and arrest.

In the fall of 2017, investigators interviewed former drug distributors who identified Sergio Martinez and his brothers as leaders of the "Brian" DTO and described how the street-level business functioned. Distributors were assigned to work different shifts and given bags containing approximately 200 grams of fentanyl to sell during their shifts. Distributors communicated with the organization through the base of operations, which was staffed by

dispatchers who would send customers to meet the distributors at different locations throughout the Merrimack Valley area. The dispatchers used "customer phones" to talk to customers and a separate "base phone" to contact the distributors. CS #5 was one of these distributors. Although he/she was able to place recorded calls to some members of the DTO leadership, he/she was not privy to information about the structure of the organization, sources of supply, or ways the DTO laundered drug money. The limits of CS #5's cooperation are discussed in detail in the wiretap affidavit. *See* Affidavit in Support of Wiretap Application ("Affidavit") at ¶¶ 27-30, 135-138.

In January of 2018, investigators presented Judge McCafferty with an application and supporting affidavit for the wiretap. The affidavit stated that wiretaps were being sought to assist the government in achieving multiple goals, including:

> (a) discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of the Target Subjects, and their associates;
>
> (b) discovering the identities and roles of all suppliers of fentanyl, heroin, cocaine, and/or other drugs or controlled substances to the identified conspirators;
>
> (c) discovering the locations where fentanyl, heroin, cocaine and/or other drugs are stored prior to distribution, and seizing quantities of drugs and drug proceeds;
>
> (d) discovering the management and disposition of proceeds generated by the organization's narcotics trafficking; and
>
> (e) obtaining admissible evidence which demonstrates beyond a reasonable doubt that the Target Subjects and any later identified targets, committed the alleged violations of law set forth herein.

*Id.* at ¶ 125. TFO Molloy explained that he believed that Sergio Martinez was using (978) 655-0001 ("Target Telephone #1") to discuss his drug business and speak with other members of DTO leadership and drug sources of supply. In the affidavit, investigators also requested

authority to intercept calls over a phone used by the defendant's brother, Alfredo Martinez,

whose role in the DTO was not yet known. Although the investigation had made some progress,

TFO Molloy explained that:

> As discussed herein, I believe that S. MARTINEZ, A. MARTINEZ, and R. MARTINEZ, are leaders of this organization locally. However, I have not yet confirmed the roles of A. MARTINEZ and R. MARTINEZ nor have I collected sufficient admissible evidence against each. A significant goal of this investigation is to dismantle the entire network of individuals who work with S. MARTINEZ and his confederates. To accomplish this, law enforcement agents still must learn and/or confirm the true identities and roles of S. MARTINEZ's associates and obtain admissible evidence against all of the participants in the conspiracy.

> To date, I have not been able to identify the movement of the bulk of the DTO's drug proceeds or the sources of supply. I am aware that the organization earns a significant amount of cash that is not reflected in the bank records I have received as part of my financial investigation thus far. Although I believe the DTO may use businesses and residential properties to launder some cash, I have not confirmed how they do this and I have not identified accounts or assets that reflect the significant amount of cash they are earning. I believe that large amounts of drug proceeds may be kept at locations or in accounts I have yet to identify.

> The investigation has led to evidence to show that S. MARTINEZ and others are involved in street level fentanyl sales and that they use runners to sell drugs at various locations throughout the Lawrence area. However, I have no information about how S. MARTINEZ procures drugs and transports them to Massachusetts. While I have received vague information indicating that S. MARTINEZ may have a source of supply in the Dominican Republic or New York, I have not been able to identify any individual or group supplying S. MARTINEZ with fentanyl, cocaine, and other drugs.

> In addition, while some witnesses believe DTO members carry firearms and use violence, I have not been able to determine how they acquire firearms nor do I have any concrete evidence of violent acts. I am aware that S. MARTINEZ purchased a pill press, but I do not have any evidence that the MARTINEZ DTO

has manufactured or sold fentanyl pills. Counterfeit pills are extremely dangerous, as those who purchase them often believe they are using pharmaceutical grade pills, when in fact they are ingesting the significantly more potent fentanyl. The investigation has not yet allowed me to confirm whether the DTO has manufactured these pills nor has it provided me opportunities for seizure.

*Id.* at ¶¶ 126-129.

TFO Molloy then devoted approximately 25 pages of the affidavit to explaining the investigative techniques that had been used or considered during the investigation. He explained why those techniques had failed to fully achieve the goals and objectives of the investigation, or appeared reasonably unlikely to succeed if tried, or were too dangerous to be tried. *Id.* at ¶¶ 124-182.

TFO Molloy discussed all of the confidential sources used or identified during the investigation. He stated that some sources were drug customers who could only buy drugs by calling the customer phones, and had no way of infiltrating the leadership, identifying sources of supply, or otherwise achieving the goals of the investigation. He also discussed how some confidential sources were incarcerated or otherwise unavailable or unwilling to cooperate at the time of the wiretap application. Finally, he discussed the confidential sources, like CS #5, who used to work as distributors for the organization and described the limits of information they were able to provide. He explained how CS #5 was currently unable to work for the organization, but how even when he/she did, his/her information was limited and he/she had only vague knowledge of sources of supply. TFO Molloy explained how CS #5 was also limited in what he/she was willing to do for fear of retaliation if he/she was identified as a cooperator. *Id.* at ¶¶ 132-140.

TFO Molloy discussed the possibility of conducting additional controlled purchases and provided a detailed explanation about why he did not consider such an approach to be a viable option. *Id.* at ¶ 141. The affidavit explained why the controlled purchases would only provide evidence about the individual making the sale, which in an organization that used various interchangeable distributors, would not achieve the goals of the investigation. The affidavit explained how "additional drug purchases from runners simply are not likely to identify those performing managerial roles in this DTO or to meaningfully impact the organization." *Id.*

TFO Molloy explained the general limitations of physical surveillance and described the efforts to use surveillance during the investigation. *Id.* at ¶¶ 142-147. For example, he explained that pole cameras had been placed near three residences associated with the DTO, and that while they were helpful in observing street level drug deals outside, they were not able to capture conversations, or exchanges between managerial level members. He also described counter surveillance techniques used by the targets, including evasive driving techniques and the use of lookouts. *Id.* at ¶ 143. He also described the use of search warrants for GPS location of cellular telephones and tracking devices on vehicles and why those techniques had failed.

TFO Molloy also discussed other investigative techniques that had been considered and/or used, including the use of undercover agents (¶¶ 148-149), search warrants (¶¶ 150-155), grand jury subpoenas (¶¶ 156-161), trash searches (¶¶ 162-163), video cameras and tracking devices (¶¶ 164-166), pen register and toll information (¶¶ 167-168), and mail covers (¶¶ 169-170). He also explained that he had considered information obtained from the financial investigation (¶¶ 172-174), and information obtained in prior investigations (¶¶ 175-182).

On January 23, 2018, Judge McCafferty issued an order authorizing the interception of

wire communications to and from Target Telephone #1 and another telephone believed to be used by Alfredo Martinez.[1]

## DISCUSSION

The defendant has filed a motion to suppress arguing that the initial affidavit of TFO Molloy failed to satisfy the "necessity" requirement set forth in 18 U.S.C. § 2518(1)(c). The defendant's arguments are meritless and should be denied without a hearing.

The procedures for obtaining judicial authorization to intercept wire, oral, and electronic communications are set forth in Chapter 119 of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which is commonly referred to as "Title III" or the "wiretap statute." *See* 18 U.S.C. §§ 2510-2521. Title III requires, in part, that the government submit an application to the court that contains (among other things) "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). A judge may authorize a wiretap if the court determines that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This requirement is sometimes called the "necessity" requirement. *United States v. Rose*, 802 F.3d 114, 118 (1st Cir. 2015).

The necessity requirement does not require the government "to show that other investigative methods have been completely unsuccessful." *United States v. Rivera-Rosario*, 300 F.3d 1, 19 (1st Cir. 2002). Rather, the government "is only required to show that it has made a reasonable good faith effort to run the gamut of normal investigative procedures" before

---

[1] Alfredo Martinez stopped using this number shortly thereafter and no communications were ever intercepted.

requesting authorization for a wiretap. *Id.* (internal quotation and citations omitted).

The necessity determination is made in the first instance by the issuing court. *United States v. Villarman-Oviedo*, 325 F.3d 1, 9 (1st Cir. 2003). When this finding is being challenged in a suppression motion or on appeal, the court does not conduct a *de novo* review of the wiretap application. *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989). Rather, this Court simply should review the sufficiency of the affidavit on its face and assess "whether the facts are reasonably adequate to support the issuing judge's implicit determination that other procedures reasonably appear unlikely to succeed." *Id.* Thus, the Court's role is to determine whether the "the application was minimally adequate to support the determination that was made." *United States v. Cartagena*, 593 F.3d 104, 109 (1st Cir. 2010) (internal quotations and citations omitted).

The defendant's motion to suppress argues that TFO Molloy's affidavit in support of the initial wiretap application did not satisfy the "necessity" requirement. He seems to make two arguments. First, he argues that the affidavit shows that the DEA's investigation was generally successful and that continued use of normal investigative techniques would have allowed the DEA to gather the information they were seeking. Def. Mem. at 8. Second, he lists various investigative techniques and argues that if the DEA pursued them, they would have achieved their goals without the wiretap. *Id.* at 8-10. Both arguments misconstrue the necessity requirement.

A.    **Despite Some Success, the Affidavit Set Forth Investigative Goals that Could Only be Achieved with a Wiretap.**

It is well settled that the partial success of an investigation does not mean that a wiretap is unnecessary. *United States v. Cao*, 471 F.3d 1, 3 (1st Cir. 2006). In fact, an investigation must

have made some progress for a wiretap to be sought because investigators must have sufficient evidence to establish probable cause for the wiretap. *Rose*, 802 F.3d at 114 at n.1. Additionally, "[b]ecause drug trafficking is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles, investigative personnel must be accorded some latitude in choosing their approaches." *United States v. David*, 940 F.2d 722, 728 (1st Cir. 1991).

The defendant argues that the government "knew the identities of all of the main players, all of the dispatchers, and all of the runners . . . and in fact listed them in the affidavit." In fact, of the thirty-four defendants charged in the indictment, only twelve were named as Target Subjects and identified before the wiretap investigation began. Furthermore, some of these Target Subjects were not fully identified and/or the government did not have sufficient admissible evidence against all of them.

In *Rivera-Rosario*, the defendant argued that evidence obtained without a wiretap provided sufficient information about the organization. The First Circuit rejected this argument, noting that "[t]hough the government's less intrusive methods had provided some valuable assistance in the investigation, much of the conspiracy's scope and dealings were still undisclosed." 300 F.3d at 19. For example, the government "was still unaware of the identity of many of the conspiracy's members and the supplier of the drugs" and "had no real knowledge about the organizational structure of the drug conspiracy." *Id.* The affidavit of TFO Molloy described a similar situation here. Investigators identified some individuals, including the defendant and his brothers, but did not fully understand their roles in the organization. The government also had only limited information about the organization's sources of supply or

methods for laundering drug proceeds. They were aware that were various other unidentified conspirators. Thus, despite some success, the affidavit clearly delineated various investigative goals not yet achieved.

Similarly, in *United States v. Lopez*, the Court found that despite some investigative success, a wiretap was appropriate because the investigation "failed to establish the identity of some conspirators, particularly those at the top of the distribution chain." 300 F.3d 46, 53-54 (1st Cir. 2002) (citing various cases allowing wiretaps where law enforcement officers had not yet identified sources of supply). *See also United States v. Abou-Saada*, 785 F.2d 1, 12 (1st Cir. 1986) (holding that even though the government had enough evidence to charge some conspirators, where they did not have enough evidence to convict "the key source of supply . . . it was reasonable to seek wiretaps to obtain evidence against *all* the key conspirators"). Accordingly, the defendant is wrong in asserting that the initial success made by the DEA in its investigation precluded the use of a wiretap to achieve the unrealized investigative goals.

> **B.     The DEA Made a Reasonable Good Faith Effort
>            to Use Normal Investigative Procedures.**

The defendant's second argument, that the DEA could have pursued additional investigative avenues, also fails because "[t]he necessity requirement is not tantamount to an exhaustion requirement." *United States v. Lopez,* 300 F.3d 46, 52 (1st Cir. 2002). There is no rule regarding the amount of time that must be devoted to traditional investigative procedures prior to seeking a wiretap. *United States v. Nelson-Rodriguez*, 319 F.3d 12, 33 (1st Cir. 2003). Courts "must test the government's recital of antecedent investigatory methods in a practical and commonsense manner." *Ashley*, 876 F.2d at 1073.

The defendant lists five investigative avenues that he argues the agents did not

sufficiently pursue and that he believes would have achieved the goals of the investigation. TFO Molloy addressed each of these investigatory techniques in his affidavit, and provided detailed explanations, based on his familiarity with this case and his training and experience, of why each technique would not achieve the goals of the investigation.

*Physical Surveillance*

The defendant concedes that law enforcement engaged in "extensive physical surveillance" but later argues that a "more robust effort at physical surveillance of the defendant and suspected leaders of the Brian group could have led to the identity of suppliers and sources of narcotics." Def. Mem. at 8. The affidavit of TFO Molloy discussed in detail his various attempts at physical surveillance of the DTO, including his use of pole cameras and tracking devices on vehicles. He explained the challenges the investigation had faced and why he believed additional surveillance alone would not achieve the goals of the investigation. Affidavit at ¶¶ 142-147. He explained how members of the DTO were very conscious of law enforcement surveillance and gave an example of a situation where a DTO member identified his law enforcement tail and engaged in counter surveillance driving maneuvers. *Id.* at ¶ 143. He explained how during controlled purchases, the DTO would frequently change the location of the drug sale whenever they thought they identified law enforcement surveillance. *Id.* He also described the DTO's use of lookouts. *Id.* He explained that many of the locations associated with the DTO are difficult places to conduct surveillance because they are located in tightknit, ethnically homogeneous areas, where it is difficult to conduct surveillance without being identified. He explained how other residences are outfitted with surveillance cameras and motion activated lights. *Id.* at ¶ 144. Finally, he explained that while physical surveillance could capture

things like hand-to-hand deals on the street, larger deliveries, meetings, and transactions typically occurred inside residences, outside the view of any surveillance team.

The defendant writes that agents learned that he traveled to New York in November 2017 and that surveillance of him during this trip could have led to identification of his source of supply. Even if agents had specific information about the defendant's travels in advance (they did not), "the law was not meant to force the government to run outlandish risks or to exhaust every conceivable alternative before seeking a wiretap." *United States v. Hoffman*, 832 F.2d 1299, 1306 (1st Cir. 1987). TFO Molloy's affidavit was more than sufficient to show how reasonable, good faith efforts to conduct surveillance did not achieve the goals of the investigation. *See Ashley*, 876 F.2d at 1075 ("The fact that the government affidavit did not exhaustively explain its failure to attempt **additional** physical surveillance specifically directed at determining [subject's] drug sources is not fatal to the sufficiency of the wiretap application."); *Hoffman*, 832 F.2d at 1307 (accepting statement in affidavit that "visual surveillance was tried, but was inconclusive" as sufficient).

<p style="text-align:center">*Confidential Sources and Sources of Information*</p>

The affidavit also included a detailed discussion of the investigation's use of confidential sources and the limitations on the information they could provide. TFO Molloy explained that CS #1, CS #2, CS #3, CS #4 and other sources of information were customers who could only buy drugs by calling the customer phones, and had no way of infiltrating the leadership, identifying sources of supply, or otherwise achieving the goals of the investigation. Affidavit at ¶¶ 133-134. The defendant notes that a cooperating individual bought 550 grams from a DTO distributor on one occasion apparently to suggest that further controlled buys could have

achieved the investigation's goals. TFO Molloy, in fact, discussed this specific purchase in the affidavit to explain why such controlled purchases had only limited utility in the investigation. *Id.* at ¶ 141. TFO Molloy explained how even the purchase of a large amount of drugs resulted only in the arrest of one of multiple interchangeable distributors. The DTO continued completely unabated after his arrest. TFO Molloy explained how this arrest showed that further purchases would not allow investigators to identify those performing managerial roles or to meaningfully impact the organization. *Id.*

He also explained that at that time of the wiretap application, CS #2, CS #3, and CS #4 were incarcerated and no longer providing active information in the investigation. CS #5 could provide historical information about working for the DTO, but at the time of the wiretap, CS #5 was being stonewalled by leadership and told he/she could not return to working of them. The affidavit explained that even if CS #5 began working for the DTO again, there were limits on what he/she could learn that would help achieve the goals of the investigation. When he/she was working for the DTO, he/she was unable to obtain information regarding the identity or specific location of any of the sources of supply used by the Target Subjects. *Id.* at ¶¶ 135-136. Additionally, CS #5 was very concerned about being identified as a cooperator and was therefore limited in the information he/she was willing to gather. *Id.* at ¶ 137. CS #6 and CS #7 were incarcerated and could not proactively cooperate at that time. *Id.* at ¶ 139.

In *Villarman-Ovieda*, the defendant argued that a confidential informant had allowed agents to identify "some of the main co-conspirators," but the First Circuit nevertheless found a wiretap necessary since the "informant lacked sufficient contacts to develop information about the structure of the organization." 325 F.3d at 10. *See also Lopez*, 300 F.3d at 54 (accepting

statements in wiretap affidavit that "cooperating sources had limited information concerning the full scope of the conspiracy"). Likewise, in this case, the cooperators had provided information about several main conspirators, but that information was not complete. Moreover, by the time TFO Molloy's affidavit was submitted, none of these individuals was in the position to provide substantial, detailed additional information that would be allow the government to prosecute all members of the conspiracy. As a result, there was more than a sufficient basis for Judge McCafferty to find that the government had made a "reasonable, good faith effort" to use confidential sources. *Lopez*, 300 F.3d at 52.

<div align="center"><em>Pen Register Evidence</em></div>

The affidavit explained that the investigation had made use of pen registers, trap and trace devices, and toll records. TFO Molloy explained how the technique only provides agents with a list of numbers called and does not establish he identities of the persons called or the contents of the conversations. TFO Molloy explained that because drug traffickers often subscribe to telephones in fictitious names or use other people's names in order to thwart law enforcement investigation of their illegal activities, it is very hard to identify who is using a phone based solely on this information. TFO Molloy explained that most of the phones used by this DTO, including Target Telephone #1, were not subscribed in the name of the people who used them. Therefore, monitoring pen registers, is not an effective way to identify people using telephones, let alone to achieve the goals of the investigation. *Affidavit* at ¶ 167. *See United States v. Santana*, 218 F. Supp. 2d 53, 57 (D. N.H. 2002) (Judge DiClerico denying wiretap suppression motion in part based on agent's statement in affidavit that "pen register information and telephone tolls had been used to verify telephone calls but could not identify the parties

<div align="center">14</div>

participating in the calls").

*Financial Investigation*

The affidavit explained law enforcement officers' efforts to collect bank records and financial documents. It also explained how the exploitation of financial records would not allow them to achieve the goals of the investigation. TFO Molloy wrote, "while financial records do provide useful evidence of unexplained wealth, absent further evidence from other means . . . financial records are not likely to provide sufficient evidence regarding the activities and scope of S. MARTINEZ's drug trafficking organization." The affidavit also explained how CS #5 told officers that the defendant used other people to conduct financial transactions on his behalf and that therefore, officers did not expect that they would find substantial evidence in his own bank records. He also wrote that this showed that the defendant was careful in how he handled money and that traditional investigative techniques would not lead to drug proceeds. Moreover, determining the location of proceeds of the organization was just one of the investigation's goals and would not likely identify sources of supply or all confederates.

*Use of Investigative Techniques Close in Time to Wiretap Investigation*

The defendant argues that the use of normal investigative techniques like "physical surveillance of targets and motor-vehicle stops of targets" close in time to the wiretap application could have achieved the goals of the investigation. This claim also must fail. As a preliminary matter, the affidavit lays out myriad investigative avenues pursued in December 2017 and January 2018 leading up to the wiretap, including interviews of CS #5, SOI #7, SOI #10, and SOI #11, telephone record analysis, use of CS #5 to place recorded telephone calls to members of the DTO, analysis of recorded jail calls of a co-conspirator, physical surveillance, and more.

*See, e.g.,* Affidavit at ¶¶ 63, 65, 66, 93-95, 101, 107, 110, 118, 170. Additionally, Sergio Martinez and Alfredo Martinez traveled to the Dominican Republic for three weeks during that timeframe (returning on January 10, 2018), making "physical surveillance" and "motor vehicle stops" of them impractical. Even if there had not been substantial investigative efforts undertaken during that time, just as "[t]here is no rule on the amount of time investigators must try and fail" the defendant has cited no case law to support a required timeframe. The analysis is whether the investigators made a reasonable and good faith effort to use other investigative means. There is no doubt that they did.

In sum, the defendant has aimed his challenges at peripheral matters. TFO Molloy's lengthy and detailed affidavit contained a full statement of the investigation to date, other techniques employed, and set forth a failure to obtain evidence against all coconspirators. Judge McCafferty reasonably concluded that other procedures were unlikely to succeed.

## CONCLUSION

The defendant simply cannot demonstrate that Judge McCafferty lacked a sufficient basis for approving the wiretaps in this case. Because the affidavit provided information that was far more than "minimally adequate" to support a finding of necessity, the defendant's necessity challenge fails. *Cartagena*, 593 F.3d at 109.[2] Because the affidavit is sufficient on its face, no suppression hearing is necessary. The defendant's motion should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

Scott W. Murray
United States Attorney

/s/ Georgiana L. Konesky
Assistant U.S. Attorney
Massachusetts Bar # 685375
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552
georgiana.konesky@usdoj.gov

/s/ Seth R. Aframe
Assistant U.S. Attorney
Massachusetts Bar # 685375
53 Pleasant Street, 4th Floor
Concord, NH 03301
603-225-1552
seth.aframe@usdoj.gov

</div>

January 28, 2019

---

[2] In the unlikely event that the Court found a lack of necessity here, suppression would nevertheless be an inappropriate remedy because the investigating agents relied in good faith upon a facially valid wiretap order. *United States v. Leon*, 468 U.S. 897 (1984).   Several circuits have found that *Leon* good faith principles apply to wiretap orders.   *See United States v. Moore*, 41 F.3d 370, 376 (8th Cir.1994) (good faith exception can apply to Title III wiretaps); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir.1988) (same).   *But see United States v. Rice*, 478 F.3d 704, 712–14 (6th Cir.2007) (finding that good faith exception does not apply in wiretap context).

## **CERTIFICATION**

I certify that a copy of this motion has been served electronically, through ECF, on counsel of record, on January 28, 2019.

/s/ Georgiana L. Konesky
Assistant U.S. Attorney