U.S. DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

OCT 08 2019

FILED

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA )
)
v. )  No. 1:18-cr-33-01-JL
)
Sergio Martinez a/k/a "Brian," a/k/a )
"Sergio Gabin," a/k/a "Cacon" )

### PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(A) and (C) of the Federal Rules of Criminal Procedure, the

United States of America by its attorney, Scott W. Murray, United States Attorney for the

District of New Hampshire, and the defendant, Sergio Martinez, and the defendant's attorneys,

William Keefe, Esquire, and Robert Sheketoff, Esquire, enter into the following Plea Agreement:

1. The Plea and The Offenses.

The defendant agrees to plead guilty to Counts Three and Thirteen of the Third

Superseding Indictment that charge him with conspiracy to commit money laundering, in

violation of 18 U.S.C. § 1956(a)(2)(B) and (h) (Count Three), and participating in a continuing

criminal enterprise in violation of 21 U.S.C. § 848 (Count Thirteen).

In exchange for the defendant's guilty plea, the United States agrees to the sentencing

stipulations identified in Section 6 of this agreement. The United States also agrees to move to

dismiss the remaining counts in the Third Superseding Indictment and the aggravating elements

under 21 U.S.C. § 848 when the defendant is sentenced.

2. The Statute and Elements of the Offenses.

Count Three:

Title 18, United States Code, Section 1956(h) provides:

- 1 -

"Any person who conspires to commit any offense defined in [Section 1956] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

The defendant understands that the offense of conspiracy to commit money laundering

has the following elements, each of which the United States would be required to prove beyond a

reasonable doubt at trial:

First, that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to commit money laundering; and

Second, that the defendant willfully joined in that agreement.

*Pattern Criminal Jury Instructions for the District Courts of the First Circuit*, Instruction

4.18.371, Internet Ed. (D. Me. Feb. 24, 2017); *Whitefield v. United States*, 543 U.S. 209, 214-17

(2005) (Overt act not an element of conspiracy under 18 U.S.C. § 1956(h)).

Title 18, United States Code, Section 1956(a)(2)(B) provides, in pertinent part:

Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity, or knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity. . . shall [be in violation of the law].

18 U.S.C. § 1956(a)(2)(B)(i). The defendant understands that the offense has the following

elements, each of which the United States would be required to prove beyond a reasonable doubt

at trial:

First, that on or about the date specified in the indictment, the defendant knowingly transported, transmitted, or transferred, funds or attempted to do so;

- 2 -

Second, at the time of the act described in element one, the defendant knew the funds represented the proceeds of some form of unlawful activity;

Third, at the same time, the defendant knew that the act was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity; and

Fourth, the act was from a place in the United States to or through a place outside the United States.

*Modern Federal Jury Instructions—Criminal*, Instruction 6.18.1956E (2018).

Count Thirteen:

Title 21, United States Code, Section 848, provides in pertinent part that a person who

engages in a continuing criminal enterprise as defined in Title 21, United States Code, Section

848(c) shall punished. The elements of this offense are:

(1) the defendant committed at least one violation of the federal drug laws that constitutes

a felony;

(2) that violation was part of a series of three or more offenses committed by the

defendant in violation of the federal drug laws;

(3) the defendant committed the offenses in the series of violations in concert with five or

more persons;

(4) the defendant occupied a position of organizer, supervisor, or any other position of

management within the enterprise with respect to those five or more persons; and

(5) the defendant obtained substantial income or resources from the series of violations of

federal law.

3. Offense Conduct.

The defendant stipulates and agrees that if this case proceeded to trial, the government

- 3 -

would introduce evidence of the following facts, which would prove the elements of the offense beyond a reasonable doubt:

### Overview of the Martinez Drug Trafficking Organization

The defendant led a drug trafficking organization that distributed fentanyl from throughout the Merrimack Valley area in Massachusetts and New Hampshire. The organization used the name "Brian" to represent its drug business and advertise to customers. The defendant ran the organization since at least 2015 through April 9, 2018, when he was arrested.

The organization served three distinct sets of customers. The first group of customers, who ordered the smallest amounts of drugs, was served by the "small phones," various telephones that were located in a specific residence and answered by dispatchers. This residence was referred to as "the base" and dispatchers staffed "the base" from 9:00 a.m. to 11:00 p.m. daily. Dispatchers took orders and directed customers to meet various distributors throughout the Merrimack Valley area. At different times during the conspiracy, the base was located at 22 Morton Street, Lawrence, Massachusetts, 82 Water Street, Lawrence, Massachusetts, and 31 Manchester Street, Lawrence, Massachusetts. Daily, these phones usually received hundreds of calls from customers placing fentanyl orders.

The second set of customers was serviced by the so-called "big phone." The big phone was reserved for customers who typically purchased from ten grams to 200 grams of fentanyl at a time, quantities which the purchasers would then distribute themselves. The defendant and his brother Raulin Martinez answered this telephone, took orders, and sent these customers to meet a different set of distributors. They promised these customers better and faster service than they received if they called the small phones. These phones received between approximately 50 and

- 4 -

100 calls daily.

A third, much smaller set of customers, who ordered particularly large quantities of fentanyl, usually one kilogram or more at a time, called the defendant directly to place orders. The organization would deliver directly to these individuals by sending a distributor, often in a taxi, to deliver to these customers at or near their residences.

On any given day, the organization employed between five and ten distributors to deliver drugs to customers in Lawrence and Haverhill, Massachusetts, and sometimes in Salem, New Hampshire. The defendant was aware that customers traveled from New Hampshire, Maine, and Massachusetts to meet his distributors. He was also aware that most of his distributors employed their own distributors. Drugs were tested, cut and packaged in a stash house, located at 176 Park Street, Lawrence, Massachusetts, and sometimes at 31 Manchester Street, Lawrence, Massachusetts, often by the defendant and others. A member of the organization collected 200-gram bags of fentanyl from the stash house and provided them to the distributors at the beginning of each shift. When a distributor sold the 200-gram bag, they would typically receive approximately $6,000 dollars (by selling the fentanyl for $30 per gram). Each distributor was paid between $500 and $800 per 200-gram bag sold, and returned the rest of the profits to the defendant.

In January of 2018, United States District Judge Landya B. McCafferty authorized the interception of a telephone number used by the defendant. This authorization was extended three times through April of 2018. The defendant used this telephone to coordinate daily operations including speaking to dispatchers at the base about which distributors were working and how much they sold, handling problems with distributors and customers, discussing arrests of drug

associates, and procuring fentanyl from sources of supply. The intercepted calls indicate that he

was directly involved in managing and supervising various people including the three dispatchers

working at the base (managing their hours and paying their salaries), determining which of 10-20

distributors would work which shifts, hiring new distributors and firing others when he was

unsatisfied with their performance, determining when to pay bail money for distributors who

were arrested, and directing cab drivers and distributors to make large deliveries to the biggest

customers. The dispatchers included Suhey Perez, Johnny Jose Naut Perez a/k/a "Caballero" and

others. Mr. Martinez also supervised numerous drug runners, including Miguel Alvarez, Trevor

Ahearn, Eduard Amparo, Edward Brailey Delacruz, Juan Rafael Tejada-Jimenez, Luis Angel

Polanco Huma, Wagner Pimentel and Ramon Gil Huma.

Intercepted calls and other evidence would prove that the defendant was involved in all

aspects of operations, purchasing supplies including 20,000 custom red plastic bags used to

package the drugs, and receiving shipments of drugs from sources of supply. For example, on

January 31, 2018, Sergio Martinez received a shipment of between 10 and 20 kilograms of

fentanyl. Through intercepted calls and surveillance, investigators determined that the defendant

and co-conspirator Ramon Gil Huma met with an individual with Texas license plates to receive

the shipment. That night, the defendant spoke to a male with a Mexican telephone number who

had clearly supplied the drugs exchanged that evening. The defendant said that he had the drugs

tested by users and complained about the quality in comparison to a prior shipment. According to

the defendant, the users said that the previous drugs, "knock us down right away, as soon as you

pinch, that's pump! Straight to the floor." With this batch, according to the defendant, "they told

me that it didn't even tickle them. I'm telling you because… when they pinched themselves, I

- 6 -

was talking to them normally, I didn't even noticed them high." The defendant proceeded to tell the supplier that the previous batch of fentanyl was so strong that "when you mix it in the blender... you have to... listen, it gets you dizzy, it knocks you out." The defendant continued that he wanted drugs that were "the strongest it comes, I don't care ... because we give it to those people to knock them out, you understand?" Later in the conversation, the defendant said, "what I look for is quality ... for when I prepare it and give it to people, because I'm a person that moves a lot.... I move 15, 30, 35 kilos a month ... just of that." The defendant frequently received shipments of multiple kilograms of drugs, tested them, and returned them if he determined they were not of a high quality.

In addition, from February through April of 2018, Judge McCafferty authorized interception of the "big phone" used by customers placing large fentanyl orders, a phone answered by both the defendant and his brother Raul Martinez. It was not uncommon for more than one kilogram of fentanyl to be sold over intercepted calls on just this telephone every day. During the wiretap, law enforcement officers seized drugs from various customers after intercepted communications indicated that they purchased drugs from the Martinez organization. For example, on March 1, 2018, the defendant arranged for the sale of approximately 180 grams of fentanyl to Norman Limoges for further distribution in New Hampshire. The New Hampshire State Police seized these drugs as Mr. Limoges attempted to bring them back to Berlin, New Hampshire. On March 14, 2018, the defendant arranged for the sale of approximately 55 grams of fentanyl to Darlene Tirone, which she intended to distribute in New Hampshire. The New Hampshire State Police seized these drugs from her in Seabrook, New Hampshire. Also on March 14, 2018, the defendant arranged for the sale of approximately 140 grams of fentanyl to

- 7 -

Amy Reardon, which she intended to distribute in New Hampshire and which was also seized from her by the New Hampshire State Police. In total, during this time, officers seized what lab results confirmed to be over 3.42 kilograms of fentanyl, mostly from customers who intended to redistribute those drugs in New Hampshire. Intercepted calls would prove that from January through April of 2018, the organization distributed well in excess of 36 kilograms of fentanyl. The government would prove this through intercepted calls, observations made during surveillance, and statements by witnesses who purchased drugs from and worked in the organization. The defendant made substantial income as a result his violation of the federal drug laws. Drug runners would testify that they provided the defendant with between \$30,000 and \$35,000 per day based on aggregate drug sales.

## Money Laundering

As just mentioned, intercepted calls, witness statements, and seizures would prove that the defendant collected thousands of dollars from drug sales daily. He laundered this money by shipping it to the Dominican Republic. Raul Martinez and Luz Perez Demartinez helped collect and count money and the defendant took it to New York to give it to people who would send it to the Dominican Republic for them. Intercepted calls and location information from the defendant's phone would prove that on or about February 3 or 4, 2018, he traveled to New York with a large amount of cash. On February 5, 2018, he gave the cash to someone who would send it to the Dominican Republic in exchange for a fee, and called Raul Martinez while that person was counting the money. Raul Martinez told the defendant that he gave him \$340,000. The defendant said that they had only counted \$331,000.

On February 25, 2018, intercepted telephone calls and witness statements would prove

- 8 -

that the defendant prepared to bring money to New York again. Over intercepted calls, the defendant told an associate that the people in New York charged him an eight percent fee to send it to the Dominican Republic. If they had to pick it up from him in Lawrence, they would charge him nine percent instead. In order to save money from that percentage point, he told his associate that he would again drive the money to New York himself.

That evening, officers conducted surveillance and saw the defendant heading towards New York. The Massachusetts State Police conducted a traffic stop and the defendant told officers that he was traveling to New York and consented to a search of the car. Pursuant to that consent search, the officers recovered over $400,494 dollars inside a bag in the backseat of the car. When asked about the money, the defendant stated that he recently sold a property in Lawrence for $450,000. Records would prove that this was not true. Officers seized the money.

After the traffic stop, the defendant called his wife, Luz Perez DeMartinez and told her, "they found the money" and they discussed procuring false paperwork to attempt to get the money back. On another intercepted call, the defendant later explained he decided not to contest the forfeiture for fear that authorities would take a closer look at his finances. A witness with firsthand knowledge of these transactions would testify that the purpose of taking the money to New York was to provide it to individuals who would then send it, in cash, to the Dominican Republic, where members of the Martinez family would receive the money. Witness statements, financial records, the lack of employment records, and intercepted calls would prove that the money was proceeds of drug trafficking. Since 2015, the defendant was not legitimately employed and supported himself with drug proceeds.

### April 9, 2018 Search Warrants

On April 9, 2018, law enforcement officers executed a search warrant at the defendant and Luz Perez DeMartinez's residence, 22 Morton Street, Lawrence, Massachusetts, Raul Martinez's residence, 82 Water Street, Lawrence, Massachusetts, 31 Manchester Street, Lawrence, Massachusetts, the stash house, 176 Park Street, Lawrence, Massachusetts, and various other residences. In Sergio Martinez and Luz Perez DeMartinez's residence, law enforcement seized over $123,434 in cash, money counting machines, red bags used to package the drugs, and a rolex watch appraised at $34,000 that the defendant was wearing. In Raul Martinez's residence, 82 Water Street, which had a barricaded door, investigators seized detailed drug ledgers, various cellular telephones with numbers that customers told law enforcement they used to call to place drug orders from the organization (including the "big phone"), approximately $54,140 in cash, and in an attic crawl space, two rifles and a silencer. In the basement of the residence, a large square hole was dug into the floor, which was empty but would have been capable of concealing contraband. At 31 Manchester Street, Lawrence, Massachusetts, officers recovered at least one kilogram of suspected fentanyl, additional quantities of packaged suspected fentanyl, various drug pressing and packaging paraphernalia (including kilogram-presses), a money counting machine, ammunition, and $27,064 in cash. In the stash house at 176 Park Street, officers found a large and sophisticated pressing and packaging mill with substantial pressing and packaging equipment, including a pill press, a large hydraulic press, various blenders and other packaging equipment, and a respirator. At least three kilograms of what lab results confirmed to be fentanyl along with other controlled substances and cutting materials were seized. Witnesses would testify that each house (22 Morton Street, 82 Water Street, and 31 Manchester Street) were used at different times as the dispatch location for

- 10 -

the drug organization and that drugs were pressed and packaged at 82 Water Street and 31

Manchester Street.

4. Penalties, Special Assessment, and Restitution.

The defendant understands that the penalties for the offense in Count Three are:

A. A maximum prison term of twenty (20) years;

B. A maximum fine of $500,000 or twice the value of the property involved in the
money laundering transactions, whichever is greater (18 U.S.C. §§ 1956(h) and
1956(a)(2)); and

C. A term of supervised release of not more than three (3) years. The defendant
understands that the defendant's failure to comply with any of the conditions of
supervised release may result in revocation of supervised release, requiring the
defendant to serve in prison all or part of the term of supervised release, with no
credit for time already spent on supervised release (18 U.S.C. §3583).

The defendant understands that the penalties for the offense in Count Thirteen are:

A. A minimum penalty of twenty years of imprisonment a maximum penalty of life
imprisonment, (21 U.S.C. § 848(a));

B. A maximum fine of $2,000,000 (21 U.S.C. § 848(a)); and

C. A term of supervised release of between five (5) years and life (21 U.S.C. § 841).

The defendant will be required to pay a mandatory special assessment of $100 for each

count of conviction ($200 in total), at or before the time of sentencing (18 U.S.C. §

3013(a)(2)(A)). In addition to the other penalties provided by law, the Court may order him to

pay restitution to the victim(s) of the offense (18 U.S.C. § 3663 or § 3663A) and forfeit property

derived from or involved in the offenses of conviction.

5. Sentencing and Application of the Sentencing Guidelines.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case

and that the Court is required to consider the United States Sentencing Guidelines as advisory

- 11 -

guidelines. The defendant further understands that he has no right to withdraw from this Plea

Agreement if the applicable advisory guideline range or his sentence is other than he anticipated.

The defendant also understands that the United States and the United States Probation

Office shall:

A.  Advise the Court of any additional, relevant facts that are presently known
    or may subsequently come to their attention;

B.  Respond to questions from the Court;

C.  Correct any inaccuracies in the pre-sentence report;

D.  Respond to any statements made by him or his counsel to a probation
    officer or to the Court.

The defendant understands that the United States and the Probation Office may address

the Court with respect to an appropriate sentence to be imposed in this case.

The defendant acknowledges that any estimate of the probable sentence or the probable

sentencing range under the advisory Sentencing Guidelines that he may have received from any

source is only a prediction and not a promise as to the actual sentencing range under the advisory

Sentencing Guidelines that the Court will adopt.

6. Sentencing Stipulations and Agreements.

Pursuant to Fed. R. Crim. 11(c)(1)(C), the United States and the defendant stipulate and

agree to the following:

(a)  A sentence of imprisonment of 540 months is the appropriate disposition
     of this case.

The parties intend the above stipulations to be "binding" under Fed. R. Crim. P.

11(c)(1)(C). By using the word binding the parties mean that if the Court will not accept the plea

- 12 -

agreement under Fed. R. Crim. P. 11(c)(3)(A), the plea agreement is null and void and the defendant will be allowed the opportunity to withdraw his guilty plea[s].

The parties are free to make recommendations with respect to the terms of imprisonment, fines, conditions of probation or supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate, unless such recommendations are inconsistent with the terms of this Plea Agreement.

7. Acceptance of Responsibility.

The United States agrees that it will not oppose a two-level reduction in the defendant's adjusted offense level, under the advisory Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the offense. The United States, however, may oppose any adjustment for acceptance of responsibility if the defendant:

A.   Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

B.   Challenges the United States' offer of proof at any time after the plea is entered;

C.   Denies involvement in the offense;

D.   Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E.   Fails to give complete and accurate information about his financial status to the Probation Office;

F.   Obstructs or attempts to obstruct justice, prior to sentencing;

G.   Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

- 13 -

H.   Fails to appear in court as required;

I.   After signing this Plea Agreement, engages in additional criminal conduct;
     or

J.   Attempts to withdraw his guilty plea.

The defendant understands and agrees that he may not withdraw his guilty plea if, for any

of the reasons listed above, the United States does not recommend that he receive a reduction in

his sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is not required to reduce the

offense level if it finds that he has not accepted responsibility.

8.   Waiver of Trial Rights and Consequences of Plea.

The defendant understands that he has the right to be represented by an attorney at every

stage of the proceeding and, if necessary, one will be appointed to represent him.   The defendant

also understands that he has the right:

A.   To plead not guilty or to maintain that plea if it has already been made;

B.   To be tried by a jury and, at that trial, to the assistance of counsel;

C.   To confront and cross-examine witnesses;

D.   Not to be compelled to provide testimony that may incriminate him; and

E.   To compulsory process for the attendance of witnesses to testify in his
     defense.

The defendant understands and agrees that by pleading guilty he waives and gives up the

foregoing rights and that upon the Court's acceptance of the his guilty plea, he will not be

entitled to a trial.

The defendant understands that if he pleads guilty, the Court may ask him questions

- 14 -

about the offense, and if he answers those questions falsely under oath, on the record, and in the

presence of counsel, his answers will be used against him in a prosecution for perjury or making

false statements.

9. Acknowledgment of Guilt; Voluntariness of Plea.

The defendant understands and acknowledges that he:

A.      Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because
        he is guilty;

B.      Is entering into this Plea Agreement without reliance upon any promise or benefit of any
        kind except as set forth in this Plea Agreement or revealed to the Court;

C.      Is entering into this Plea Agreement without threats, force, intimidation, or coercion;

D.      Understands the nature of the offense to which he is pleading guilty,
        including the penalties provided by law; and

E.      Is completely satisfied with the representation and advice received from
        his undersigned attorney.

10. Scope of Agreement.

The defendant acknowledges and understands that this Plea Agreement binds only the

undersigned parties and cannot bind any other non-party federal, state or local authority. The

defendant also acknowledges that no representations have been made to him about any civil or

administrative consequences that may result from his guilty plea. The defendant understands

such matters are solely within the discretion of the specific non-party government agency

involved. The defendant further acknowledges that this Plea Agreement has been reached

without regard to any civil tax matters that may be pending or which may arise involving the

defendant.

11. Collateral Consequences.

- 15 -

The defendant understands that as a consequence of his guilty plea he will be adjudicated guilty and may thereby be deprived of certain federal benefits and certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms.

The defendant understands that, if he is not a citizen of the United States, his guilty plea to the charged offense will likely result in him being subject to immigration proceedings and removed from the United States by making him deportable, excludable, or inadmissible. The defendant also understands that if he is a naturalized citizen, his guilty plea may result in ending his naturalization, which would likely subject him to immigration proceedings and possible removal from the United States. The defendant understands that the immigration consequences of this plea will be imposed in a separate proceeding before the immigration authorities. The defendant wants and agrees to plead guilty to the charged offense regardless of any immigration consequences of this plea, even if this plea will cause his removal from the United States. The defendant understands that he is bound by his guilty plea regardless of any immigration consequences of the plea. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on any immigration consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction, or sentence, based on any immigration consequences of his guilty plea.

12.   Satisfaction of Federal Criminal Liability; Breach.

The defendant's guilty plea, if accepted by the Court, will satisfy his federal criminal liability in the District of New Hampshire arising from his participation in the conduct that forms the basis of the indictment [or information] in this case. The defendant understands that if, before

- 16 -

sentencing, he violates any term or condition of this Plea Agreement, engages in any criminal activity, or fails to appear for sentencing, the United States may consider such conduct to be a breach of the Plea Agreement and may withdraw therefrom.

13.    Forfeiture

The defendant agrees to immediately and voluntarily forfeit to the United States his interest, if any, in any and all assets subject to forfeiture pursuant to 21 U.S.C. § 853 and 28 U.S.C. § 2461(c), as a result of his guilty plea, including, but not limited to: (A) Land and Buildings located at 31 Manchester Street, Lawrence, Massachusetts; (B) Land and Buildings located at 82 Water Street, Lawrence, Massachusetts; (C) Land and Buildings located at 22 Morton Street, Lawrence, Massachusetts, and (D) All funds in Banco Popular Dominicano, S.A. Accounts 794605782 and 795430263, in the name of Sergio Martinez.

The defendant represents and warrants that he is the sole and exclusive owner of the defendant's ownership interests in the funds in Banco Popular Dominicano, S.A., account numbers 794605782 and 795430263, in the name of Sergio Martinez, and that he has all legal right to transfer the same without the intervention of any other third party. The defendant agrees to execute and deliver to the Government all such documents and instruments and to do all such other acts and things as may be required to secure the defendant's obligations hereunder, to record and file all such documents and instruments, and to do any and all other acts, at such time or times, in such manner and at such place or places, all as may be necessary to establish, validate, preserve, protect, perfect and repatriate the funds in Banco Popular Dominicano, S.A., account numbers 794605782 and 795430263, in the name of Sergio Martinez, and to complete the forfeiture of the entirety of his interests to the United States.

- 17 -

The defendant acknowledges that all of the above-described forfeitable assets are subject to forfeiture as property constituting or derived from any proceeds the defendants obtained, directly or indirectly, from the drug conspiracy.

Pursuant to 18 U.S.C. § 981(a)(1)(A) and 28 U.S.C. § 2461(c), the defendant further agrees to forfeit to the United States all of his right, title, and interest in any property, real or personal, which constitutes or is derived from proceeds the defendant obtained that are traceable to the money laundering offense charged in Count Three and to the drug trafficking offense charged in Count Thirteen of the Indictment. The defendant further agrees that the aggregate value of such property was $2,000,000.00; that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists; and that the United States is therefore entitled to forfeit substitute assets equal to the value of the proceeds obtained the defendant, in an amount not to exceed $2,000,000.00 (the "Money Judgment"). The defendant consents to the entry of an order requiring the defendant to pay the Money Judgment, in the manner described below (the "Order"), and that the Order will be final as to the defendant prior to sentencing, pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, and which may be satisfied in whole or in part with substitute assets. The defendant further agrees that upon entry of the Order, the United States Attorney's Office is authorized to conduct any discovery needed to identify, locate, or dispose of property sufficient to pay the Money Judgment in full or in connection with any petitions filed with regard to proceeds or substitute assets, including depositions, interrogatories, and requests for production of documents, and the issuance of subpoenas.

All payments made in full or partial satisfaction of the Money Judgment shall be made by postal money order, bank, or certified check, made payable in this instance to the United States

- 18 -

Marshals Service, indicating the defendant's name and case number on the face of the check; and shall be delivered by mail to the United States Attorney's Office, District of New Hampshire, Attn: Asset Forfeiture Unit, 53 Pleasant Street, 4th Floor, Concord, New Hampshire 03301.

The defendant agrees and consents to the forfeiture of his interest in these assets pursuant to any criminal, civil and/or administrative forfeiture.

None of the forfeitures set forth in this section shall be deemed to satisfy or offset any fine, restitution, cost of imprisonment, or other penalty imposed upon the defendant, nor shall the forfeitures be used to offset the defendant's tax liability or any other debt owed by the defendant to the United States.

The defendant agrees to waive all constitutional, statutory, and any other challenges in any manner, including, without limitation, by direct appeal and/or habeas corpus, to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including the following: (1) the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the U.S. Constitution; (2) failure to comply with any and all requirements of Fed. R. Crim. P. 11(b)(1)(J) pertaining to the Court's advice at the change of plea hearing; and, (3) failure to comply with any and all requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument and announcement of the forfeiture at sentencing and incorporation of the forfeiture in the judgment. The defendant further acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in this case.

The defendant waives and releases any and all claims he may have to any property seized by the United States, or any state or local law enforcement agency and turned over to the United

States, during the investigation and prosecution of this case, whether forfeited or not. The defendant agrees to hold the United States, its agents, and employees, and any state or local law enforcement agency participating in the investigation and prosecution of this case, harmless from any claims whatsoever in connection with the seizure and forfeiture, as well as the seizure, detention and return of any property in connection with the investigation and prosecution of this case.

The defendant acknowledges that the properties to be forfeited under this section are subject to forfeiture as property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the said violations and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the illegal conduct.

The defendant further agrees that not later than the date he enters his plea of guilty he will provide a complete and accurate financial disclosure statement on the form provided by this office.  If the defendant fails to provide a complete and accurate financial disclosure statement by the date he enters his plea of guilty, or if this office determines that he has intentionally failed to disclose assets on his financial disclosure statement, the defendant agrees that that failure constitutes a material breach of this agreement, and this office reserves the right, regardless of any agreement or stipulation that might otherwise apply, to oppose any downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, and to seek leave of the Court to withdraw from this agreement or seek other relief.

14.  Waivers.

A.  Appeal.

The defendant understands that he has the right to challenge his guilty plea and/or

sentence on direct appeal. By entering into this Plea Agreement the defendant knowingly and

voluntarily waives his right to challenge on direct appeal:

1.      His guilty plea and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues, or claims challenging the constitutionality of the statute of conviction; and

2.      The sentence imposed by the Court if it is consistent with or lower that the stipulated sentence set forth in paragraph 6 of this Agreement.

The defendant's waiver of his rights does not operate to waive an appeal based upon new

legal principles enunciated in Supreme Court or First Circuit case law after the date of this Plea

Agreement that have retroactive effect; or on the ground of ineffective assistance of counsel.

B.   Collateral Review

The defendant understands that he may have the right to challenge his guilty plea and/or

sentence on collateral review, e.g., a motion pursuant to 28 U.S.C. §§ 2241 or 2255.   By

entering into this Plea Agreement, the defendant knowingly and voluntarily waives his right to

collaterally challenge:

1.      His guilty plea, except as provided below, and any other aspect of his conviction, including, but not limited to, adverse rulings on pretrial suppression motion(s) or any other adverse disposition of pretrial motions or issues, or claims challenging the constitutionality of the statute of conviction; and

2.      The sentence imposed by the Court if it is consistent with or lower that the stipulated sentence set forth in paragraph 6 of this Agreement.

The defendant's waiver of his right to collateral review does not operate to waive a

collateral challenge to his guilty plea on the ground that it was involuntary or unknowing, or on

the ground of ineffective assistance of counsel. The defendant's waiver of his right to collateral

review also does not operate to waive a collateral challenge based on new legal principles

- 21 -

enunciated by in Supreme Court or First Circuit case law decided after the date of this Plea

Agreement that have retroactive effect.

C. Freedom of Information and Privacy Acts

The defendant hereby waives all rights, whether asserted directly or through a

representative, to request or receive from any department or agency of the United States any

records pertaining to the investigation or prosecution of the case(s) underlying this Plea

Agreement, including without limitation any records that may be sought under the Freedom of

Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

D. Appeal by the Government

Nothing in this Plea Agreement shall operate to waive the rights or obligations of the

Government pursuant 18 U.S.C. § 3742(b) to pursue an appeal as authorized by law.

15.  No Other Promises.

The defendant acknowledges that no other promises, agreements, or conditions have been

entered into other than those set forth in this Plea Agreement or revealed to the Court, and none

will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

16.  Final Binding Agreement.

None of the terms of this Plea Agreement shall be binding on the United States until this

Plea Agreement is signed by the defendant and the defendant's attorney and until it is signed by

the United States Attorney for the District of New Hampshire, or an Assistant United States

Attorney.

17.    Agreement Provisions Not Severable.

The United States and the defendant understand and agree that if any provision of this

- 22 -

Plea Agreement is deemed invalid or unenforceable, then the entire Plea Agreement is null and void and no part of it may be enforced.

SCOTT W. MURRAY
United States Attorney

Date: 10/8/19              By: _____
                               Georgiana L. Konesky
                               Assistant United States Attorney
                               Bar Association #685375
                               53 Pleasant St., 4th Floor
                               Concord, NH 03301
                               Georgiana.Konesky@usdoj.gov

The defendant, Sergio Martinez, certifies that he has read this 23-page Plea Agreement and that he fully understands and accepts its terms.

Date: 10-8-19              _____
                           Sergio Martinez, Defendant

I have read and explained this 23-page Plea Agreement to the defendant, and he has advised me that he understands and accepts its terms.

Date: 10/8/19              _____
                           Robert Sheketoff, Esquire
                           Attorney for Sergio Martinez

- 23 -