**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/12/21

1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * *
                                      *
4     UNITED STATES OF AMERICA        *
                                      *
5                                     * No. 1:18-cr-00033-01-JL
              v.                      * October 8, 2019
6                                     * 9:10 a.m.
                                      *
7     SERGIO MARTINEZ,                *
                                      *
8                       Defendant.    *
                                      *
9     * * * * * * * * * * * * * * * * *

10

                TRANSCRIPT OF DAY SIX OF JURY TRIAL
11
              BEFORE THE HONORABLE JOSEPH N. LAPLANTE
12

13
      APPEARANCES:
14

15    For the Government:      AUSA Seth R. Aframe
                               AUSA Georgiana Konesky
16                             United States Attorney's Office (NH)

17    For the Defendant:       Robert L. Sheketoff, Esq.
                               Sheketoff Law Offices
18
                               William Keefe, Esq.
19                             Law Office of William Keefe

20    Interpreter:            Heidi Cazes

21

22    Court Reporter:          Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
23                             United States District Court
                               55 Pleasant Street
24                             Concord, NH 03301
                               (603) 225-1454
25

I  N  D  E  X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **DARLENE TIRONE** | | | | |
| By Ms. Konesky | 4 | | | |
| By Mr. Keefe | | 16 | | |
| | | | | |
| **ALICIA MORAN** | | | | |
| By Ms. Konesky | 22 | | | |
| By Mr. Keefe | | 36 | | |
| | | | | |
| **SCOTT MOORE** | | | | |
| By Ms. Konesky | 40 | | | |
| By Mr. Sheketoff | | 44 | | |
| | | | | |
| **JUAN INFANTE** | | | | |
| By Mr. Aframe | 46 | | | |
| By Mr. Sheketoff | | 84 | | |
| | | | | |
| **EDUARD AMPARO** | | | | |
| By Mr. Aframe | 89 | | | |

E  X  H  I  B  I  T  S

Govt's_____ In Evd.

15......................53

1           P R O C E E D I N G S

2           THE CLERK:  All rise for the Honorable Court.  The

3    Court has before it for consideration this morning Day 6 of the

4    jury trial in Criminal Case 18-cr-33-01-JL, <u>United States of</u>

5    <u>America versus Sergio Martinez</u>.

6           THE COURT:  Good morning ladies and gentlemen of the

7    jury.  Welcome back to court.  Have any of you had any

8    conversations with each other or anyone else regarding the

9    trial during the recess?  Have any of you done any kind of

10   independent research or investigation on the case in any source

11   during the recess?  All right.  There being no affirmative

12   answer, we'll proceed.

13          Just a reminder, a couple of things, just housekeeping

14   details.  Tomorrow we're in recess because of another

15   proceeding I have to conduct.  It's an all-day proceeding.

16   Plus, it's a religious holiday for some faiths.

17   Also, today the lunch break will be at about 1:00 p.m., not the

18   normal 12:30.

19          All right.  Let's proceed.

20          MS. KONESKY:  Thank you, your Honor.  The United

21   States calls Darlene Tirone.

22          THE CLERK:  Please stand and raise your right hand

23          **DARLENE TIRONE**, having been duly sworn by the Clerk,

24   was examined and testified as follows:

25          THE CLERK:  And, for the record, could you state your

1    full name and spell your last name.

2            THE WITNESS:  Darlene Tirone, T-i-r-o-n-e.

3            THE CLERK:  Thank you.  Please be seated.

4                      DIRECT EXAMINATION

5    BY MS. KONESKY:

6    Q.   Good morning, Ms. Tirone.

7    A.   Good morning.

8    Q.   How old are you?

9    A.   Forty-three.

10   Q.   And are you currently serving a prison sentence?

11   A.   Yes.

12   Q.   Where are you serving that sentence?

13   A.   Carswell, Texas.  Forth Worth Texas.

14   Q.   And is that a federal prison?

15   A.   Yes.

16   Q.   Before you were in jail where did you live?

17   A.   In Seabrook, New Hampshire.

18   Q.   And where are you from originally?

19   A.   Massachusetts.

20   Q.   How long have you lived in New Hampshire?

21   A.   About 14 years.

22   Q.   Do you have any children?

23   A.   Yes.

24   Q.   How old?

25   A.   24-year-old son.

1    Q.    Ms. Tirone, before you were sent to jail what did you do

2    for work?

3    A.    Restaurant work.

4    Q.    Okay.  And have you been diagnosed with any mental-health

5    issues?

6    A.    Depression.

7    Q.    Do you take any medication for that?

8    A.    Yes.

9    Q.    Other than the crime you're serving a sentence for, which

10   we'll talk about in a minute, have you previously been

11   convicted of any crimes?

12   A.    Minor crimes, yes.

13   Q.    Okay.  Can you just briefly summarize what those are.

14   A.    There was a few domestic-related issues in my 20s, a few

15   driving issues, and a willful concealment.

16   Q.    Okay.  Now, what are you currently serving a sentence for?

17   A.    Conspiracy distribution.

18   Q.    Of what?

19   A.    Fentanyl.

20   Q.    And what sentence did you receive?

21   A.    Thirty-six months.

22   Q.    How much of that sentence do you have left to serve?

23   A.    Eleven months.

24   Q.    Ms. Tirone, in exchange for your testimony today, do you

25   hope to receive anything?

1   A.   I hope to receive a sentence reduction, but --

2   Q.   Okay.  And if you would like to receive that, what is it

3   you have to do?

4   A.   Truthfully answer your questions.

5   Q.   Okay.  And do you have any promise or agreement with the

6   government about any specific sentence reduction that you might

7   get?

8   A.   No, no.

9   Q.   And who is it that ultimately determines whether or not

10  you get a sentence reduction and how much that would be?

11  A.   The judge.

12  Q.   Does whether or not Mr. Martinez gets convicted of a crime

13  have anything to do with whether or not you'll get a

14  recommendation?

15  A.   No.

16  Q.   And what happens if you don't testify truthfully?

17  A.   I don't get a recommendation.

18  Q.   I'd like to talk a bit about your drug use history now.

19  Can you tell me when you first started using illegal drugs?

20  A.   I was about 14.

21  Q.   And what did you use when you were 14?

22  A.   Marijuana.

23  Q.   Have you used other illegal drugs in your life?

24  A.   Mm-hmm.  Yes.

25  Q.   Tell me about that.

1   A.   I started with prescription painkillers when I was 24, and

2   it escalated very quickly.

3   Q.   And you originally received painkillers from a doctor?

4   A.   Mm-hmm.  Yes.

5   Q.   Okay.  And did you develop an addiction?

6   A.   Yes, very quickly.

7   Q.   And tell me how that escalated.

8   A.   You just can't get enough.  Once you take a couple, then

9   you want a couple more, and a couple more, and a couple more,

10  and then, when the doctor doesn't give them to you anymore, you

11  buy them on the streets.

12  Q.   And did you begin buying pills on the streets?

13  A.   Yes.

14  Q.   And at some point did that escalate to other drugs?

15  A.   Yes.

16  Q.   What did you start using?

17  A.   I started using heroin.

18  Q.   And how old were you when you started using heroin?

19  A.   About 38.

20  Q.   And did you ever start to use anything other than heroin?

21  A.   I did cocaine once in a while, but it wasn't my drug of

22  choice.

23  Q.   Okay.  And how about fentanyl?

24  A.   I started using fentanyl, yes.

25  Q.   Okay.

1    A.    Through patches.

2    Q.    Okay.  And were the fentanyl patches prescribed by a

3    doctor?

4    A.    No.

5    Q.    Did you ever use fentanyl in any other form?

6    A.    Yes.

7    Q.    How would you use fentanyl?

8    A.    Snort it.

9    Q.    Okay.  Ms. Tirone, who is your source of supply for

10   fentanyl?  Where would you get it?

11   A.    In Lawrence, Mass.

12   Q.    And did you buy it from any specific person in Lawrence,

13   Mass?

14   A.    No.  I mean, a guy with a name of "Brian," but nobody that

15   I knew specific.

16   Q.    Okay.  And how did you learn about the source of supply

17   Brian?

18   A.    A friend of mine just gave me a phone number.

19   Q.    How would you contact Brian?

20   A.    Call on the phone.

21   Q.    And just tell me how that would work.  What would happen

22   after you placed a phone call to Brian?

23   A.    You would get a location to go to, and you'd go to the

24   location, and someone shows up, and then they leave.

25   Q.    Okay.  And, specifically, what happens when they show up?

1    A.    You grab the stuff, and you give them the money, and you

2    go.

3    Q.    Okay.

4    A.    You get out of there as quick as possible.

5    Q.    Okay.  How long, if you remember, did you buy from Brian?

6    A.    A couple of years.  Two, three years, approximately.

7    Q.    And did you always call the same phone number?

8    A.    Most of the time, but it did change.

9    Q.    Okay.  Do you recall the area code of a phone number you

10   were calling near the end of the time you were buying from

11   Brian?

12   A.    Did I what?

13   Q.    Do you recall the area code of the number you were

14   calling?

15   A.    There was a 978 and a 603.

16   Q.    Okay.  What was the most recent number you were calling

17   before you were arrested?

18   A.    603, yeah.

19   Q.    And before your arrest about how long were you calling

20   that 603 number?

21   A.    I can't be exactly sure.  Maybe six months to a year,

22   maybe.

23   Q.    Okay.

24   A.    That's approximate.  I don't really remember.  I was

25   pretty high.

1  Q.   Okay.  When you would call that number, did you know the
2  person who would answer?
3  A.   No.
4  Q.   When you would go to Lawrence to conduct the exchange,
5  would you always meet with the same person?
6  A.   No.
7  Q.   Can you estimate how many different people you met with?
8  A.   No.
9  Q.   More than ten?
10  A.   I can't really be sure.  I mean, it was a quick -- I
11  didn't really stop to check the person out.
12  Q.   Okay.  Did you always go to Lawrence, or did you sometimes
13  meet people in other towns?
14  A.   Very rarely went to other places.
15  Q.   Okay.  Tell me some of the other places that you went.
16  A.   I mean, like Lowell.  I went to Plaistow I think twice.
17  Very rare, though.
18  Q.   Okay.  And how often were you buying from Brian?
19  A.   Five to seven days a week.
20  Q.   And when you would go down would you buy just for
21  yourself, or would you sometimes buy for other people?
22  A.   No.  For other people, too.
23  Q.   And how many other people were you buying for?
24  A.   Like, five.
25  Q.   Okay.

1    A.    Approximately.

2    Q.    Okay.  And tell me how that would work.  Would you collect

3    money from them before you'd go?  Would they pay you after?

4    A.    Yes, I would collect money before I went, and I would

5    double the price so that I would get my fix for free,

6    basically.

7    Q.    Okay.  And so, how much would you pay for a gram of

8    fentanyl in Lawrence?

9    A.    $30.

10   Q.    And you said you would double the price, you would charge

11   $60 for it?

12   A.    Mm-hmm.  Mm-hmm.

13   Q.    Okay.  Would you bring that back to people in the

14   Seabrook, New Hampshire area?

15   A.    Yes.

16   Q.    Okay.  Okay, Ms. Tirone.

17         MS. KONESKY:  Ms. Blanco, if you could please pull up

18   Exhibit 1601.

19   Q.    Did you listen to some telephone calls in my office before

20   today?

21   A.    Yes.

22   Q.    And did you recognize your voice on those calls?

23   A.    Yes.

24         MS. KONESKY:  Whenever you're ready, you can play

25   1601.

1       (Audio recording played)

2   Q.   Ms. Tirone, was that your voice on that call?

3   A.   Yes.

4   Q.   And that call was on February 24th of 2018 at 6:23 p.m.

5   I'm going to ask you a couple questions about it.  You said, "I

6   need" -- you said, "I'm down."  What does that mean?

7   A.   It means I'm already down in Lawrence.

8   Q.   Okay.  You said, "I need 41."  What did you mean by "41"?

9   A.   Grams.

10  Q.   "All fives, please."  What does that mean?

11  A.   Five-gram chunks.

12  Q.   Okay.  Was there another way that they would sometimes

13  give them to you?

14  A.   Yeah, one gram.

15  Q.   Okay.  Why did you prefer five-gram chunks?

16  A.   Because they weighed better.

17  Q.   And by "weighed better," what do you mean?

18  A.   They weighed five grams.

19  Q.   Okay.  Near the end of that phone call you are told, "The

20  code is 809."  Explain to me why you were given a code and how

21  that would work.

22  A.   Because a lot of people in Lawrence come up to you and try

23  to sell you their stuff or fake stuff, and you want to know

24  it's the right person.

25  Q.   Okay.  And so, what would you do with that code?

1   A.   You'd ask the runner, "Who are you," and they would tell

2   you the code, and you would know it was the right person.

3   Q.   Okay.  And why was it important to you to be meeting Brian

4   or the person you were calling?

5   A.   Because you want to have the right stuff.

6   Q.   Okay.

7   A.   You don't want to get fake stuff or get ripped off or

8   lower quality.

9   Q.   I'm sorry.  I didn't hear what you said.

10  A.   Lower quality.

11       MS. KONESKY:  Okay.  Exhibit 1602, please, and this

12  call was from March 6 of 2018 at 5:19 p.m.  You can go ahead

13  and play the call, Ms. Blanco.

14                  (Audio recording played)

15  Q.   Ms. Tirone, did you recognize your voice on that call?

16  A.   Yes, ma'am.

17  Q.   What did you mean by "55"?

18  A.   Grams.

19  Q.   And you said, "Last night I got powder bags, and I can't

20  break those up."  What are "powder bags"?

21  A.   Not rock; it's just powder.

22  Q.   Okay.  And just explain to me simply the difference

23  between the consistency of the two?

24  A.   One's in a solid form and one's broken up into powder.

25  Q.   Okay.  Why do you prefer something that's rock?

1    A.    Because I feel like, as a drug addict, it's a better

2    quality, and it's not as easy to get ripped off, and it's

3    easier to break up and separate to people.

4    Q.    Okay.  Ms. Tirone, do you remember March 14th of 2018?

5    A.    I think it was the night I got stopped.

6          MS. KONESKY:  Okay.  Exhibit 1603, please.  Go ahead,

7    and you can play this.  This is on March 14th at 16:16 p.m.

8                    (Audio recording played)

9    Q.    Do you recognize your voice?

10   A.    Yes.

11   Q.    "49."  What is that?

12   A.    Grams.

13   Q.    Why were you owed two from Hancock Street?

14   A.    Because I got shorted the time before I went down.

15         MS. KONESKY:  And Exhibit 1604, please, Ms. Blanco.

16   This is another telephone call from the same day, March 14th,

17   2018 at 6:42 p.m.

18                    (Audio recording played)

19   Q.    "Five chunks."  What did you mean by that?

20   A.    Five-gram bag.

21   Q.    Okay.  And, Ms. Tirone, did you buy drugs that day?

22   A.    Yes.

23   Q.    And what happened on your way home?

24   A.    We got stopped.

25   Q.    Which police agency stopped you?

1    A.    I believe it was the State Police.

2    Q.    And what town was that in?

3    A.    Seabrook.

4    Q.    New Hampshire?  Okay.  And did the State Police find drugs

5    in your car or on your person?

6    A.    On my person.

7    Q.    And had you hidden them on your person?

8    A.    Yes.

9    Q.    And were those the drugs that you had purchased in

10   Lawrence?

11   A.    Yes.

12   Q.    And were those drugs all for you, or did you intend to

13   give them to other people?

14   A.    Half of it was for me.

15   Q.    Okay.  And then half is for other people?

16   A.    Yes.

17   Q.    Were you arrested or released that day?

18   A.    Released.

19   Q.    Okay.  And did you ever go back to buy from Brian?

20   A.    No.

21   Q.    Did you continue to buy drugs after that?

22   A.    Yes.

23   Q.    How did you do that?

24   A.    On the streets.

25   Q.    Okay.

1    A.    Wherever I could.

2    Q.    Okay.  And were you later arrested?

3    A.    Yes.

4    Q.    And are those the charges that you're currently facing?

5    A.    Yes.

6    Q.    Finally, Exhibit 1605, please.  Who is that, Ms. Tirone?

7    A.    That's me.

8    Q.    Thank you.

9                         CROSS-EXAMINATION

10   BY MR. KEEFE:

11   Q.    Ms. Tirone, you mentioned on March 14th you think that was

12   the day that you got stopped by New Hampshire State Police?

13   A.    Yes, I believe so.  They were undercover.

14   Q.    And you had traveled to Lawrence, picked up 40-some-odd

15   grams, and on the return trip to Seabrook is when you got

16   pulled over?

17   A.    Yes.

18   Q.    You mentioned that you got released.

19   A.    Yes.

20   Q.    Did you get arrested that day and brought to a police

21   station and then bailed?

22   A.    No.

23   Q.    You were just sent on your way from --

24   A.    After I gave up the drugs, they sent me home, yes.

25   Q.    Were you driving?

1    A.    No.

2    Q.    Passenger?

3    A.    Passenger.

4    Q.    Driver get arrested?

5    A.    No.

6    Q.    Car seized or confiscated?

7    A.    No.

8    Q.    You just drove off?

9    A.    Yes.

10   Q.    And I think you said that you discontinued, stopped buying

11   in Lawrence?

12   A.    Yes.

13   Q.    Now, you got arrested shortly thereafter?

14   A.    April 23rd.

15   Q.    April 23rd.  And you got arrested for the charges that you

16   faced in this case?

17   A.    Yes.

18   Q.    And when you got arrested, you got brought to court and

19   you had an arraignment?

20   A.    Yes.

21   Q.    Your first appearance in court?

22   A.    Yes.

23   Q.    Were you held or were you released on bail?

24   A.    I was held.

25   Q.    Held.  And did you remain held until today?

1   A.   Yes, the whole time.

2   Q.   And I think you said that you pled guilty.  Do you recall

3   when it was that you pled guilty?

4   A.   I don't know the exact date.  It was January.

5   Q.   Not the exact date, but you think it was sometime this

6   past winter?

7   A.   Yes.  I got sentenced in January, yes.

8   Q.   You were facing a ten-year minimum mandatory sentence in

9   this case?

10   A.   Yes.

11   Q.   And you received a three-year sentence?

12   A.   Yes.

13   Q.   Your projected release date on that three-year sentence,

14   do you know what that is?

15   A.   December of 2020.

16   Q.   Did you receive a probation-type sentence to run after --

17   A.   Three years, yeah.

18   Q.   -- your jail sentence?

19   A.   Three-year probation.

20   Q.   Three-year supervised release, is what they call it here?

21   A.   Supervised release, yes.

22   Q.   So, you as of this date have approximately 18, almost 18

23   months' credit towards that --

24   A.   Yes.

25   Q.   -- 36-month sentence?

1    A.    Yes.

2    Q.    You did get good time on a federal sentence; is that

3    right?

4    A.    Yes.

5    Q.    So, you wouldn't end up serving the entire 36 months?

6    A.    December 2020 is my good time out date.

7    Q.    So, in exchange for your testimony today, you're

8    anticipating that you're going to be resentenced; you're going

9    to go back in front of the Court --

10   A.    Yes.

11   Q.    -- and have another sentencing hearing?

12   A.    Yes.

13   Q.    And the Court with --

14   A.    I believe so, yes.

15   Q.    The Court, with knowledge that you've appeared here and

16   testified on behalf of the prosecutors, is in a position to

17   give you a lower sentence?

18   A.    It's up to the judge.

19   Q.    But that's what you're hoping for?

20   A.    I'm hoping, yes.

21   Q.    Yeah.  And you're hoping that you're going to get a

22   time-served sentence, right?

23   A.    I'm hoping.

24   Q.    Now, you mentioned that you had been buying for a couple

25   of years in Lawrence from a number that you knew as "Brian,"

1   right?

2   A.   Yes.

3   Q.   And those numbers that you called changed over time?

4   A.   Yes.

5   Q.   I think that's what you said.

6   A.   Yes.

7   Q.   After you got arrested, did you understand that the Brian

8   number continued to run as an operation?

9   A.   I don't know.  I stopped calling that day.

10  Q.   Do you recall that you gave a proffer at some point?  Do

11  you know what a "proffer" is?

12  A.   No.

13  Q.   Do you recall last year in August that you sat down at the

14  U.S. Attorney's Office and had a meeting with the prosecutors

15  and some agents?

16  A.   Yes.

17  Q.   And they questioned you about what you know about this

18  investigation and what your role in the offense was?

19  A.   Yes.

20  Q.   Do you recall telling the agents and the prosecutors that

21  you learned after your arrest, after April 9th, that the

22  telephone number of Brian continued to operate with sales of

23  fentanyl in Lawrence?

24  A.   Can you repeat -- I'm sorry.

25  Q.   Do you recall telling the prosecutors and/or the agents

1    that you learned that --

2    A.    I heard.

3    Q.    -- that the telephone number Brian continued to operate in

4    Lawrence after April --

5    A.    Yes, but it's not the same phone number that I called,

6    though.

7    Q.    But that the Brian operation --

8    A.    A random phone number, yes.  Yeah, one of the random phone

9    numbers that I never called myself, personally.  Someone told

10   me they still called it.

11   Q.    But that it was Brian --

12   A.    Yes.

13   Q.    -- that was operating it?

14   A.    That's what he said, yes.

15   Q.    Thank you.

16              THE COURT:  Redirect?

17              MS. KONESKY:  No, your Honor.

18              THE COURT:  The Court Security Officer can remove the

19   witness.  Thank you.

20                   (Witness stepped down)

21              MS. KONESKY:  The United States calls Alicia Morin.

22              THE CLERK:  Good morning.  If you would like to step

23   this way.  If you would carefully step into the witness box and

24   remain standing.

25              **ALICIA MORIN,** having been duly sworn by the Clerk, was

1    examined and testified as follows:

2              THE CLERK:  Please state your full name and spell your

3    last name.

4              THE WITNESS:  Alicia Morin, M-o-r-i-n.

5              THE CLERK:  Thank you.  Please be seated.

6                          DIRECT EXAMINATION

7    BY MS. KONESKY:

8    Q.   Good morning, Ms. Morin.

9    A.   Good morning.

10   Q.   Are you currently serving a prison sentence, Ms. Morin?

11   A.   I am.

12   Q.   Where are you serving that?

13   A.   Alderson, West Virginia.

14   Q.   And what type of a prison is that in West Virginia?

15   A.   Camp status.

16   Q.   Is it a federal prison?

17   A.   Yeah.

18   Q.   Before you went to prison, Ms. Morin, where were you

19   living?

20   A.   Northfield, New Hampshire.

21   Q.   Okay.  And are you originally from New Hampshire?

22   A.   No.

23   Q.   Where were you born?

24   A.   Massachusetts.

25   Q.   How long have you lived in New Hampshire?

```
1   A.    Since I was eight.

2   Q.    Always in Northfield?

3   A.    No.  Laconia.

4   Q.    Okay.  How old are you?

5   A.    Thirty-one.

6   Q.    And do you have any children?

7   A.    I do.  I have two.

8   Q.    How old are your children?

9   A.    My son's 14; my daughter's 11.

10  Q.    And how far did you go in school?

11  A.    High school graduate.

12  Q.    Before your legal troubles were you working?

13  A.    Off and on, yeah.

14  Q.    And where would you work?  Where have you worked in the

15  past?

16  A.    I worked for a towing company more so, and then I worked

17  for local hotels around my area.

18  Q.    And what area are you talking about?

19  A.    Belknap County.

20  Q.    Do you have any mental-health diagnoses?

21  A.    Mm-hmm.

22  Q.    Can you tell me what they are?

23  A.    I have PTSD, anxiety, and, um -- yeah.  Sorry.  Bipolar.

24  Q.    And do you take medications for those?

25  A.    I do.
```

1    Q.    Other than the crime that you're currently serving a

2    sentence for, have you previously been convicted of any crimes?

3    A.    I had a misdemeanor for criminal threatening and a

4    possession.

5    Q.    A possession of what?

6    A.    Fentanyl.

7    Q.    Okay.  And let's talk about why you're currently in jail.

8    What charge have you been sentenced for?

9    A.    It is conspiracy to possess with intent to distribute 400

10   grams or more of fentanyl.

11   Q.    And were you charged in Federal Court in New Hampshire?

12   A.    Yes.

13   Q.    And what sentence did you receive?

14   A.    A 37-month.

15   Q.    And how much of that do you have left to serve?

16   A.    I believe it's, like, 24 months.

17   Q.    Okay.  And are you currently in a program at the jail?

18   A.    I am.  It's the Residential Drug Abuse Program.  It's

19   called "RDAP."

20   Q.    And can you tell me about what RDAP is?

21   A.    So, basically, when addicts go to prison they want to,

22   like, get down to, like, why they criminally did stuff, and it,

23   like, helps with your thought process and what your irrational

24   thinking errors are and your criminal thinking errors.  It more

25   focuses on you and your problems than it does your drug.

1    Q.   Okay.  And how long have you been in that program?

2    A.   I was in it for six months.  It's a nine-month program.

3    Q.   Okay.  And do you get some time off your sentence by

4    completing that program?

5    A.   I do.  At the completion of RDAP, I get 12 months off my

6    sentence and six months' halfway house.

7    Q.   Okay.  So, if you had stayed in prison and had finished

8    that program, what was your expected release date?

9    A.   February 4th of 2020 would be my bed date for the halfway

10   house.

11   Q.   Okay.  Ms. Morin, in exchange for your testimony today are

12   you hoping to receive anything?

13   A.   I mean, I hope, but it's not guaranteed.

14   Q.   What is it that you hope will happen?

15   A.   Just a reduction of my sentence or be brought close to

16   home.

17   Q.   Do you understand who makes those decisions, who decides

18   what your sentence will be?

19   A.   Yes, I do, ma'am.

20   Q.   Who's that?

21   A.   The judge.

22   Q.   And what role does the U.S. Attorney's Office have?

23   A.   Just a recommendation.

24   Q.   Okay.  And if you want to get that kind of a

25   recommendation, what is it that you have to do?

1   A.   Testify honestly.

2   Q.   Okay.  What happens if you don't testify honestly?

3   A.   I could be facing more charges.

4   Q.   Okay.  I'd like to talk a little bit now, Ms. Morin, about

5   your drug-use history.  Can you tell me when you first started

6   using illegal drugs?

7   A.   I was 17 when I had my son, and I was prescribed Percocet.

8   I had to have an emergency C-section.  So, from 17 to 26 I was

9   on opioid painkillers, and then 26 is when I did my first line

10  of heroin, and then it just escalated from there.  I went from

11  heroin to carfentanil to fentanyl and methamphetamine.

12  Q.   Okay.  At your height how much fentanyl were you using a

13  day?

14  A.   Probably about three, four grams a day.

15  Q.   And when is the last time that you used?

16  A.   April 22nd of 2018.

17  Q.   Okay.  And did something happen on April 23rd?

18  A.   Yeah.  I was arrested.

19  Q.   Before your arrest on April 23rd, Ms. Morin, who was your

20  source of supply for fentanyl?

21  A.   Brian.

22  Q.   And is "Brian" a person or a group?

23  A.   I honestly don't know.  I just knew "Brian."

24  Q.   Okay.  And how did you first learn about Brian?

25  A.   My friend Heidi, I would drive her down to Lawrence, Mass,

1    and she would call in and order, and I would drive her to where

2    she had to go and pick up.

3    Q.   Okay.  And at some point did you start buying from Brian

4    yourself?

5    A.   I did, once Heidi got arrested.

6    Q.   And tell me when you first started going down to Brian

7    with Heidi.  About how long ago was that?

8    A.   Oh, man.  Probably about two years ago, if not a little

9    longer.

10   Q.   Okay.  And when did you start calling yourself?

11   A.   It was right after she got arrested, and I want to say two

12   years ago is when she got arrested, so probably a month after

13   she got arrested.

14   Q.   Okay.  And what happened -- why after her arrest did you

15   start calling yourself?

16   A.   Because I didn't want to be sick, and, like, I could get

17   stuff locally back home, but it wasn't enough to keep me from

18   being sick.

19   Q.   Okay.  What do you mean by "being sick"?

20   A.   Like, dope sick.

21   Q.   What's that --

22   A.   Sick from not having it.  It's horrible.  It's worse than

23   the flu.  Like, you just want to die from it.

24   Q.   And why was it that what you could buy locally wasn't

25   enough for you?

1    A.    The potency, I'm guessing.

2    Q.    Okay.  So, tell me about, once you started calling, how it

3    would work.  How would you use that phone number to buy

4    fentanyl?

5    A.    Well, first I started calling by a Massachusetts number,

6    and I would call when I was at Exit 2 on 93 and get an address

7    to where I was supposed to go to meet a runner, and then I'd go

8    meet the runner, and I'd jump back on 93 and head back north.

9    Q.    Okay.  Did you meet the same runner every time?

10   A.    No.

11   Q.    Can you estimate how many different runners you met?

12   A.    Over a handful.

13   Q.    Okay.  And when you would meet the runner what would

14   happen?

15   A.    I would give them the money.  Like, sometimes we would

16   use, like, a number if.  Like, I didn't feel safe with it.  The

17   runner would have to know that number in order for me to hand

18   over my money.

19   Q.    Okay.  And what would they give you in exchange?

20   A.    Fentanyl.

21   Q.    How was that fentanyl packaged?

22   A.    It was either single grams or five grams in one bag.

23   Q.    Okay.  You said at the beginning you called a

24   Massachusetts number?

25   A.    Mm-hmm.

1    Q.    Did that number change?

2    A.    Yeah.  I then ended up calling a New Hampshire number.

3    Q.    Okay.  How did you get that number?

4    A.    I had called down one night to plan a trip for the next

5    day, and Brian had answered and told me that he was going to

6    call me back to answer my phone, so when he called me back he

7    said, "This is the number that I want you to use," which it was

8    the 603-233 number.  So, that's the number that I started

9    calling.

10   Q.    Okay.  How much were you paying per gram in Lawrence?

11   A.    30.  $30.

12   Q.    And would you only by buy for yourself, or would you buy

13   for other people as well?

14   A.    No.  I bought for other people as well.

15   Q.    Okay.  And would you charge them more than $30 a gram?

16   A.    No, because what I did is I -- if they threw in money with

17   me when I went down to pick up I would give it to them at my

18   price, but they would have to give me a gram or two off every

19   ten that they bought.

20   Q.    Okay.  So, you would get drugs in exchange for going down

21   to Lawrence?

22   A.    Yeah.  Basically, being the driver.

23   Q.    Okay.  And where were most of the people you would buy

24   drugs for?

25   A.    My local area, Belknap County.

1    Q.   Okay.  And when you would go down, was it always to

2    Lawrence, or did you sometimes go to other places?

3    A.   I went other places.

4    Q.   Can you tell me some of the other towns you went to?

5    A.   Salem, Haverhill, Lowell, Seabrook.

6    Q.   Ms. Morin, before court today did you listen to some

7    recorded telephone calls?

8    A.   Yeah.

9    Q.   And did you recognize your voice on those calls?

10    A.   Yes.

11    Q.   Okay.  I'm going to play Exhibit 1501.  This is Exhibit

12    1401, and this phone call is from March 9th, 2018 at 1:25 p.m.

13                    (Audio recording played)

14    Q.   Did you recognize your voice on that call?

15    A.   Yes, I do.

16    Q.   And when you said you're coming down for 55, what did you

17    mean?

18    A.   Going down to Lawrence, Mass. to pick up 55 grams of

19    fentanyl.

20    Q.   Okay.  And what's "110 Lexington"?

21    A.   That's the address where the runner would have been.

22    Q.   Okay.  And did you know the real name of the person you

23    were talking to?

24    A.   No.

25            MS. KONESKY:  Another call just shortly thereafter,

1   March 9th, 2018 at 1:46 p.m.  It's Exhibit 1402, please, Ms.

2   Blanco.

3                   (Audio recording played)

4   Q.   Ms. Morin, do you remember -- did you recognize your voice

5   on that call?

6   A.   Yes, I do.

7   Q.   And do you remember buying fentanyl on March 9th of 2018?

8   A.   Yes, I do.

9   Q.   What happened after you bought the fentanyl that day?

10  A.   I got pulled over on Interstate 93 at Exit 3, the onramp,

11  and I had -- I got, basically, arrested on the side of the

12  road.  I ended up handing over 39 grams of fentanyl to the

13  officer, and then he searched my vehicle.

14  Q.   Okay.  And were you by yourself or with other people that

15  day?

16  A.   No.  My fiance and one of my friends was with me.

17  Q.   Okay.  And where had you put the drugs that you ended up

18  giving up to the police officer that day?

19  A.   He sat me in the back of his car, and he told me that,

20  basically, he knew I had it, so we could do it two ways, the

21  easy way or the hard way, and he said that he was going to give

22  me the chance to put everything on the seat next to me, and he

23  would take it all and I'd be able to go home, or we can go down

24  to the Police Department and he could get a warrant for it.

25             So, I decided just to give it over to him.  Like, I

```
 1    knew, I already knew that I was followed out, so -- and then,

 2    when I was sitting in the vehicle, while he had pulled the

 3    other two passengers out, I had hid some fentanyl in a candy

 4    box.

 5    Q.   Okay.  And let's pull up Exhibit 1406, please.  Do you

 6    recognize that?

 7    A.   Yes, I do.

 8    Q.   That's the candy box where you had hidden the fentanyl?

 9    A.   Yes.

10    Q.   Can you show us where in that picture the fentanyl is?

11    A.   Right here and here (indicating).

12    Q.   Okay.  And where were the rest of the drugs?

13    A.   My friend Tara had 15 grams on her, which we ended up

14    taking home with us, and the rest of them the cop had.

15    Q.   Were you hiding some of them?

16    A.   I had them in my bra.

17    Q.   Okay.  And the cop never found the ones on your friend?

18    A.   Uh-uh.

19    Q.   Could you please pull up Exhibit 1405.  Who is that?

20    A.   That's me.

21    Q.   And when was that taken?

22    A.   March 9th.

23    Q.   Okay.  That's when the officer pulled you over?

24    A.   Mm-hmm.

25    Q.   Okay.  Ms. Morin, did you go to jail that day?
```

1    A.    No.

2    Q.    Were you allowed to leave the scene?

3    A.    Yes.

4    Q.    And did you stop buying fentanyl from the Brian group

5    after that?

6    A.    No.

7    Q.    Why not?

8    A.    I was just so far into my addiction that, like, it didn't

9    matter to me.

10         MS. KONESKY:  Okay.  Ms. Blanco, if you could please

11    pull up Exhibit 1403.

12    Q.    This is a phone call about five days later, March 14th,

13    2018 at 4:06 p.m.

14    A.    Mm-hmm.

15              (Audio recording played)

16    Q.    Okay, Ms. Morin.  Did you recognize your voice?

17    A.    I do.

18    Q.    And when you say, "They took all my dope," what's "dope"?

19    A.    Fentanyl.

20    Q.    Okay.  And this may be obvious, but why were you scared to

21    go back down to Lawrence?

22    A.    Because I wasn't trying to catch a case.

23    Q.    What do you mean by "catch a case"?

24    A.    Like, get arrested again for fentanyl.

25    Q.    Okay.  You said, "I can't find nothing compared to what

1   you guys have down there."

2   A.   Mm-hmm.

3   Q.   Was that true?

4   A.   Yes.

5   Q.   And how did the other drugs that you could find compare?

6   A.   So, like, around Belknap County they have heroin, not

7   fentanyl.  So, the fentanyl is stronger than the heroin to me.

8   Q.   Okay.  And you went down with $1,000 that day?

9   A.   Yes.

10          MS. KONESKY:  Ms. Blanco, could you just pull up

11   Exhibit 1404.  And this is a call just later that day, March

12   14th, 2018 at 4:31 p.m.

13                    (Audio recording played)

14   Q.   Ms. Morin, did you end up buying drugs that day?

15   A.   Yes.

16   Q.   And why did you give him a description of your car?

17   A.   Every time I went down I had to give the vehicle I was in

18   and whether it was Mass. plates or New Hampshire plates.

19   Q.   Okay.  And I'm going to show you exhibit -- do you

20   remember anything about the runner that you met with that day?

21   A.   I believe he was the same runner that I met all the time

22   on Toye Ave.

23   Q.   Okay.  Had you gone to Toye Ave. before?

24   A.   Yes.  Numerous amounts of times I went there.

25          MS. KONESKY:  Exhibit 1309, please.

1   Q.   Do you recognize that car?

2   A.   Yes.

3   Q.   Why do you recognize it?

4   A.   Because that's the vehicle I was down there in, and it

5   belongs to Tara Davere (ph).

6   Q.   It's a blue Kia?

7   A.   Yeah.

8   Q.   And do you remember -- do you know where this area is?

9   A.   Yeah.  That's Toye Ave. parking lot.

10  Q.   And do you recognize the person approaching your car?

11  A.   Yeah.  I met him there.

12  Q.   Okay.  Did you buy drugs from him there?

13  A.   Yes.

14  Q.   Did you continue to buy fentanyl from the Brian group

15  until you were arrested?

16  A.   Yes.

17  Q.   And when were you arrested?

18  A.   April 23rd, 2018.

19  Q.   And do you remember what color bags the drugs were

20  packaged in?

21  A.   Yeah.  Red.

22  Q.   Red bags?

23  A.   Yeah.

24  Q.   Okay.  And since your arrest have you been in jail the

25  whole time, or were you released?

1    A.   I was released.

2    Q.   And did you receive some drug treatment?

3    A.   Yes, I did.  After I was arrested and they put the

4    three-day hold on me, I had asked to be released into inpatient

5    treatment.  So, I ended up going to Addiction Recovery Center

6    in Strafford County, and then from there I went to the Turning

7    Point Program, and then from there I got to go home for a few

8    months until sentencing.

9    Q.   Okay.  And since you received treatment have you used any

10   drugs?

11   A.   No.

12        MS. KONESKY:  No further questions.  Thank you.

13        THE COURT:  Cross.

14                       CROSS-EXAMINATION

15   BY MR. KEEFE:

16   Q.   Ms. Morin, you mentioned a friend of yours named Heidi.

17   Do you recall talking about her?

18   A.   Mm-hmm.

19   Q.   And I think you said that you began to personally go down

20   to Lawrence after Heidi was arrested.

21   A.   Yes.

22   Q.   Do you recall that Heidi was arrested in November of 2017?

23   A.   Yes.

24   Q.   So, that's when you first started going to Lawrence?

25   A.   Yes.

1    Q.   And I think you mentioned that you called a Massachusetts

2    number, and you later called a 603 area code number?

3    A.   Yes.

4    Q.   March 9th you got stopped on your way back from making a

5    purchase in Lawrence, right?

6    A.   Yes.

7    Q.   You didn't get arrested, you got released?

8    A.   Yes.

9    Q.   You continued to purchase from Brian, right?

10   A.   Yes.

11   Q.   And I think you said just now that you continued to

12   purchase up until you got arrested, right?

13   A.   Yes.

14   Q.   You got arrested on April 23rd?

15   A.   Yes.

16   Q.   And you're buying from runners, same number?

17   A.   Yeah.  Well, the number that I used -- I was calling after

18   the New Hampshire number was off was the Massachusetts number

19   again.

20   Q.   But you were still buying from Brian in your mind?

21   A.   Yeah.

22   Q.   Yeah.  And after your April 23rd arrest I think you said

23   you went into inpatient detox, inpatient?

24   A.   Yeah, June 4th.

25   Q.   So, you were held from the date of your arrest until June

1    4th?

2    A.    Yes, at Strafford County.

3    Q.    And then I think you said you went into a program called

4    Turning Point?

5    A.    Yes, at Southern New Hampshire -- it's right there, the

6    same building.  It's ARC and then Turning Point.

7    Q.    Now, you pled guilty to the charges in this case and

8    received a sentence of how long?

9    A.    Thirty-seven months.

10   Q.    You were facing a ten-year minimum mandatory sentence?

11   A.    Yes.

12   Q.    You're doing the residential drug program at the federal

13   prison that you're at in West Virginia, right?

14   A.    Yes.

15   Q.    And I think you said that you're six months through it,

16   and if you complete the program you're due to head to a halfway

17   house in February?

18   A.    Yes.

19   Q.    This coming February?

20   A.    Yes.

21   Q.    As a result of coming here and testifying, are you still

22   on track to complete the program if you go back to West

23   Virginia?

24   A.    I can definitely go back into the program, but I won't

25   graduate the program in January, and I won't go to the halfway

1    house in February.  I get set back three months.

2    Q.   For the moment you're going to be local, incarcerated,

3    until you have a sentencing hearing in this court again?

4    A.   A what?

5    Q.   A resentencing hearing.  Well, I'll withdraw the question.

6    You said earlier that you were hoping that you would get some

7    consideration for your testimony here today --

8    A.   Yeah.

9    Q.   -- specifically a reduced sentence?

10   A.   Yeah.

11   Q.   So, you're expecting to come back here in front of the

12   court to have a hearing about that?

13   A.   Yes.

14   Q.   And your hope is that your sentence will be reduced,

15   right?

16   A.   Yes.

17   Q.   And you're hoping for time served --

18   A.   Yes.

19   Q.   -- so that you would get out and --

20   A.   Or stay closer, not have to go back to West Virginia.

21   Yeah.

22   Q.   You do have a supervised-release, probation-type sentence

23   that you're facing?

24   A.   Yeah.  I have three years after.

25        MR. KEEFE:  Thank you.  Thank you, your Honor.

1          THE COURT:  Redirect?

2          MS. KONESKY:  No further questions.  Thank you.

3          THE COURT:  The Court Security Officer can remove the

4     witness.  Thank you.  Please call your next witness.

5                    (Witness stepped down)

6          MS. KONESKY:  The United States calls Scott Moore.

7          THE CLERK:  Good morning, sir.  If you'd like to step

8     this way.  Please step into the witness box and remain

9     standing.

10          **SCOTT MOORE**, having been duly sworn by the Clerk, was

11     examined and testified as follows:

12          THE CLERK:  And, for the record, please state your

13     full name and spell your last name.

14          THE WITNESS:  Scott Moore, M-o-o-r-e.

15          THE CLERK:  Please be seated.

16                    DIRECT EXAMINATION

17     BY MS. KONESKY:

18     Q.   Good morning, Mr. Moore.

19     A.   Good morning.

20     Q.   Mr. Moore, where do you live?

21     A.   Greenville, South Carolina.

22     Q.   Okay.  And where are you employed?

23     A.   International Plastics.

24     Q.   What kind of a company is International Plastics?

25     A.   We do packaging, supply, flexible plastics for industrial

1    business use.

2    Q.   Okay.  And give me an example of some kinds of the plastic

3    products that you sell.

4    A.   We do anything from the zip bags like you'd use at home,

5    retail bags like you get at the store.  We even do evidence

6    security bags for law enforcement, property bags for hospitals.

7    So, any application that involves flexible plastics.

8    Q.   And what's your position with International Plastics?

9    A.   I'm a senior sales representative.

10   Q.   How long have you worked there?

11   A.   A little over five years.

12   Q.   Okay.  And can you tell us about what some of

13   International Plastics clients are?

14   A.   Probably the largest that most people would recognize

15   would be Hobby Lobby.  We do their retail bags.

16   Q.   Okay.  And what types of clients, generally, does

17   International Plastics serve?

18   A.   We serve all sizes, from international companies to mom

19   and pop selling items out of their home, arts and crafts

20   businesses, all the way up to the large ones.

21   Q.   And do you recall selling some plastic bags to a person

22   named Sergio Martinez?

23   A.   I do.

24   Q.   And what kind of -- specifically what did you sell to him?

25   A.   He wanted some plastic sandwich bags like you would get at

42

1    the store, but he needed them to be red.

2           MS. KONESKY:  Okay.  I am going to pull up

3    Government's Exhibit 1901, please.

4    Q.    How did Mr. Martinez contact you?

5    A.    He called.

6    Q.    Okay.

7    A.    Telephone.

8    Q.    And before that phone call had you had any interaction

9    with him?

10   A.    No, ma'am.

11          MS. KONESKY:  If you could please play it.  This is

12   from January 30th, 2018 at 1:20 p.m.

13                     (Audio recording played)

14   Q.    Mr. Moore, did you recognize your voice on that phone

15   call?

16   A.    Yes.

17   Q.    And just to clarify, what's the product that you're

18   talking about?

19   A.    It's a plastic sandwich bag.

20   Q.    And you say, "We have those in stock."  Do you have a

21   store or a warehouse?

22   A.    We have a warehouse.  We don't do walk-in sales.  We sell

23   to distributors and businesses.

24   Q.    And this was a custom order, so not something you had in

25   the warehouse?

1    A.    Correct.

2          MS. KONESKY:  Ms. Blanco, if you please pull up

3    Exhibit 1902, and this is from January 30th, 2018 at 4:53 p.m.

4                    (Audio recording played)

5    Q.    Is that your voicemail?

6    A.    Yes, ma'am.

7    Q.    And do you recall receiving this message?

8    A.    I don't recall that specific message, no.

9    Q.    Did you, in fact, look into those bags for Mr. Martinez?

10   A.    Yes.

11   Q.    And did you send him a quote?

12   A.    Yes, I did.

13   Q.    And how would you have sent that, by email or --

14   A.    Sent that by email, yes.

15         MS. KONESKY:  Ms. Blanco, Exhibit 1903, please.  And

16   this is a call from February 21st, 2018, a couple of weeks

17   later, at 4:47 p.m.

18                   (Audio recording played)

19   Q.    Mr. Moore, did you recognize your voice on that call?

20   A.    Yes, I did.

21   Q.    And did you go ahead and place this order?

22   A.    Yes, we did.

23   Q.    I'm going to show you Exhibit 1905.  Do you recognize

24   this?

25   A.    Yes.

1  Q.   What is it?

2  A.   That's an invoice for the sale, for the bags that we had

3  discussed.

4       MS. KONESKY:  And, finally, Exhibit 1904, and this is

5  from March 20th, 2018, 2:44 p.m.

6                      (Audio recording played)

7  Q.   Mr. Moore, do you know if that order was, in fact,

8  delivered?

9  A.   It was, yes.

10  Q.   And did you have any other interactions with Mr. Martinez

11  after that?

12  A.   I did not, no.

13  Q.   Okay.  Thank you.

14  A.   Thank you.

15                      CROSS-EXAMINATION

16  BY MR. SHEKETOFF:

17  Q.   Good afternoon.  Good morning.

18  A.   Good morning.

19  Q.   Wishful thinking.

20       What does 20,000 plastic sandwich bags weigh?

21  A.   I couldn't tell you offhand.  I'm sorry.

22  Q.   Is it 100 pounds, or 200 pounds, or something less than

23  that?

24  A.   It may be around 100.  I really don't know.  I'm sorry.

25  Q.   Okay.  And was this order actually paid for?

```
 1    A.    Yes, sir.

 2    Q.    And how was it paid?

 3    A.    Credit card.

 4    Q.    Do you remember whose name the credit card was in?

 5    A.    I do not.

 6    Q.    Was there a phone call that just didn't get played that

 7    you recall having where you got a credit card number?

 8    A.    Yes, sir.

 9    Q.    And was that person that you were speaking to, did he

10    identify himself as Sergio Martinez?

11    A.    I do not know.

12    Q.    Thank you, sir.

13             THE COURT:  Redirect?

14             MS. KONESKY:  No, your Honor.

15             THE COURT:  This witness is excused.  Thanks.

16             THE WITNESS:  Thank you, sir.

17                   (Witness stepped down)

18             MR. AFRAME:  The United States calls Task Force

19    Officer Juan Infante.

20             **JUAN INFANTE**, having been duly sworn by the Clerk, was

21    examined and testified as follows:

22             THE CLERK:  And, for the record, please state your

23    full name and spell your last name.

24             THE WITNESS:  Sure.  First name is Juan, last name

25    Infante, I-n-f-a-n-t-e.
```

1    THE CLERK:  Thank you.

2                    DIRECT EXAMINATION

3    BY MR. AFRAME:

4    Q.   Good morning, Mr. Infante.  How are you?

5    A.   Good morning.  Good.  Thank you.

6    Q.   How are you employed?

7    A.   I am a State Trooper with the New Hampshire State Police.

8    Q.   And are you working right now for the State Police or for

9    some other law enforcement agency?

10   A.   I'm still employed by the New Hampshire State Police.  I'm

11   also a Task Force Officer with the DEA.

12   Q.   And how long have you been a DEA Task Force Officer?

13   A.   For the last four years.

14   Q.   Okay.  And what was your role in this case?

15   A.   I'm one of the case agents.

16   Q.   Okay.  So, what I want to do first, Officer Infante, is

17   some sort of housekeeping things that we have to take care of

18   based on all the evidence that we've heard.  So, we've heard a

19   lot of calls in this trial, many of them someone has already

20   testified about Mr. Martinez's voice being on the call --

21   A.   Yes.

22   Q.   -- but there are some that that has not happened.  Have

23   you been here for most of the trial?

24   A.   Yes, I have.

25   Q.   And are you familiar with Sergio Martinez's voice?

1    A.    Yes, I am.

2    Q.    Have you had multiple opportunities to speak with him

3    during the course of this investigation and afterwards?

4    A.    Yes.

5    Q.    And how about his brother, Raulin?  Have you had the

6    opportunity to speak with him as well?

7    A.    Yes.

8    Q.    And can you distinguish their voices?

9    A.    Yes.

10   Q.    So, I'm going to run through now -- not playing these

11   calls.  You've either heard them in here or seen them before

12   trial, right?

13   A.    Yes.

14   Q.    So, this will just take a minute.  If we could pull up

15   106.  This is a call involving Patricia English, who has

16   already testified in this trial.  Did you listen to this call

17   before the trial?

18   A.    I did.

19   Q.    And did you recognize the other voice on that call as

20   Raulin Martinez?

21   A.    Yes.

22   Q.    Okay.  And turning to 401 -- I'll try to do this as

23   quickly as possible, so I'm going to show you 401 through 403.

24   A.    Okay.

25   Q.    Just very quickly, because I don't think you were in court

1   when this was played out loud, but did you listen to it before

2   trial?

3   A.   I have.

4   Q.   We don't need to play it.  So, we just need to show

5   Mr. Infante the three transcripts.  This is 401.  This is 402.

6   Again, did you listen to this one before trial?

7   A.   Yes.

8   Q.   And 403.  And did you identify the voice, not Trevor

9   Ahearn, but the other voice on those calls as Sergio Martinez?

10  A.   I did.

11  Q.   The rest of the calls I believe you were actually in

12  court.  Turning to Government's Exhibit 803, and if we could

13  just turn to the next page.  This was a call we already heard

14  involving Trooper Jameson Mathieu related to the $400,000

15  seizure.  Were you in court for this call?

16  A.   Yes.

17  Q.   And was the other voice on that call Mr. Martinez, Sergio

18  Martinez?

19  A.   Yes.

20  Q.   Now, turning to the 1400 series, you were just in court

21  when we just heard Alicia Morin testify?

22  A.   Yes.

23  Q.   Did you listen to that series of calls?

24  A.   Yes.

25  Q.   Ms. Morin identified her voice on each of those calls.

1   Did you recognize Sergio Martinez as the other voice in those

2   calls?

3   A.   Yes.

4   Q.   Turning to the 1500 series, were you here yesterday when

5   Norman Limoges testified?

6   A.   Yes.

7   Q.   And did you listen to the series of calls involving Norman

8   Limoges?

9   A.   Yes.

10  Q.   And did you recognize the other voice in that series of

11  calls, which were the 1500 calls, as Sergio Martinez?

12  A.   I did.

13  Q.   And this morning you were here when Darlene Tirone

14  testified?

15  A.   Yes.

16  Q.   And you listened to 1603, so the 1600 series, 1601 to

17  1604?

18  A.   Yes.

19  Q.   Did you recognize the voice other than Ms. Tirone as

20  Sergio Martinez?

21  A.   Yes.

22  Q.   Yesterday we heard testimony from Amy Reardon.  Do you

23  remember that?

24  A.   Yes.

25  Q.   And we played a series of calls in which Ms. Reardon

1   identified her voice?

2   A.   Yes.

3   Q.   And did you recognize the voice other than Ms. Reardon as

4   Sergio Martinez?

5   A.   Yes.

6   Q.   And yesterday we heard testimony from Mr. Norman Torrey.

7   Were you here for that?

8   A.   Yes.

9   Q.   I'd ask that you look at transcripts 1801 to 1804.  And

10  did you recognize the voice on those calls that were played

11  yesterday as Sergio Martinez?

12  A.   Yes.

13  Q.   And I would ask you to look at the transcripts for 1805 to

14  1808, just to remind you of the content of those calls.  And

15  did you recognize the voices in that series of calls as

16  belonging to Mr. Raulin Martinez?

17  A.   Yes.

18  Q.   And, finally, just a couple of minutes ago we heard from

19  Scott Moore.  And did you listen to the calls we played of

20  Mr. Moore?

21  A.   Yes.

22  Q.   And did you recognize the individual that wasn't Mr. Moore

23  as Sergio Martinez in those calls?

24  A.   Yes.

25          MR. AFRAME:  Okay.  Let me turn now to some

1      involvement that -- let me do one more bit of housekeeping

2      related to the calls, since we're doing that.

3            Judge, I'd like to just read now a stipulation related

4      to the calls to the jury.

5            THE COURT:  Please.

6            MR. AFRAME:  I'm going to read you now a stipulation,

7      which is something that the parties have agreed to.

8            The parties do hereby agree and enter into the

9      following stipulations of fact regarding wiretap recordings.

10           Each of the transcripts and recordings of telephone

11     calls presented during trial were produced from recordings

12     contained on Government's Exhibit 13.  Each transcript and

13     recording contains the contents of a true and accurate copy of

14     a telephone conversation intercepted pursuant to a

15     court-ordered wiretap of telephone numbers 978-655-0001 and

16     603-233-6702.  Each of the recordings contained on Government's

17     Exhibit 13 accurately reproduces both the words spoken and the

18     sound of the speakers' voices as those words were spoken and as

19     those sounds occurred in the original conversations reproduced

20     in each of the recordings.  Each of the recordings contained on

21     Government's Exhibit 13 occurred on the dates and at the times

22     listed on the transcripts that correspond to the conversations

23     played or read in Court.

24           Some of the transcripts of recorded conversations

25     presented at trial were of conversations spoken in Spanish, and

1   others were spoken in English.  Where the words spoken during

2   the recorded conversations were in Spanish, the transcripts

3   provide an accurate translation from the Spanish language to

4   the English language.

5          Agreed to on this 2nd day of October, 2019.

6          Signed Seth R. Aframe, Assistant United States

7   Attorney, Georgiana L. Konesky, Assistant United States

8   Attorney, Sergio Martinez, defendant, Robert Sheketoff, counsel

9   for the defendant.

10          THE COURT:  Ladies and gentlemen of the jury, that's a

11   stipulation.  You might remember I told you during the

12   preliminary instructions there's three types of evidence:

13   there's testimony, there's exhibits, and there's stipulations.

14   A stipulation is an agreement between the parties.  Once a

15   stipulation has been reached and presented to you, you may find

16   the facts that have been set forth in the stipulation have been

17   proven beyond a reasonable doubt.

18          You may proceed.

19          MR. AFRAME:  Thank you, your Honor.

20   BY MR. AFRAME:

21   Q.   And, Officer Infante, I just made a reference to

22   Government's Exhibit 13, a CD of telephone calls.

23   A.   Yes.

24   Q.   Are you familiar with this CD?

25   A.   Yes.

1    Q.   And what is that?

2    A.   A series of calls from the wire.

3    Q.   Is that the Government's Exhibit 13 referred to in the

4    stipulation?

5    A.   Yes.

6    Q.   Thank you.

7         THE COURT:  Mr. Aframe, just so we have a clear

8    record, that stipulation you just read, will it be marked as an

9    exhibit?

10        MR. AFRAME:  We do.  Thank you.  It is Government's

11   Exhibit 15.

12        THE COURT:  So, Exhibit 15 is the stipulation.  It

13   will be one of the exhibits that is in the jury deliberation

14   room when you're deliberating.

15        (Government's Exhibit 15 received into evidence)

16   Q.   Let me turn now to a different piece of housekeeping.

17   This has to do with identifying the drugs that have been

18   discussed in this trial, and I have a series of certifications

19   that I'm going to show you now.

20        These -- the first one is marked as Government's

21   Exhibit 14.  The ID has been stricken on all of these.  Let me

22   show it to you and ask you does this drug certification relate

23   to the drugs that were seized from Patricia English on

24   September 8th, 2017?

25   A.   This specific one that I have in my hands, no.  This is --

1    Q.   Okay.  What's the date of seizure, the date of the

2    incident on this item?

3              THE COURT:  What item is that?

4              MR. AFRAME:  Sorry.  We're still on Government's

5    Exhibit 14.

6    A.   The date of seizure on this one is September 8, 2017.

7    Q.   Was that the date that Patricia English was arrested with

8    a quantity of drugs?

9    A.   This is the day from the buy bust that we conducted in

10   Lawrence with the defendant named Juan Dimel Gil Castillo, that

11   Patricia English was the CI on the date.

12   Q.   Thank you.

13   A.   Maybe I was confusing the question.

14   Q.   Sorry.  My question was confusing.

15   A.   Okay.

16   Q.   So, explain again, were these drugs obtained from an

17   undercover named Dan Clemmons?

18   A.   Yeah.  Dan Clemmons from Mass. State Police.

19   Q.   And they were purchased from an individual working for the

20   Brian organization?

21   A.   Yes.

22   Q.   And Patricia English was acting as the CI?

23   A.   Correct.

24   Q.   I asked that question poorly.  Thank you.

25             And now I'm showing you -- and I'm sorry.  Did that

1    document indicate that the drugs seized that day were fentanyl

2    and weighed 552.17 grams?

3    A.   Yes.

4    Q.   Thank you.  Now I'm showing you what's been marked as

5    Government's Exhibit 14A.

6    A.   Yes.

7    Q.   Were these drugs seized from Ramon Gill Huma on February

8    2nd, 2018?

9    A.   Yes.

10    Q.   And does this certification indicate that the drugs seized

11    were fentanyl?

12    A.   Yes.

13    Q.   And does it indicate that 1,123.75 grams of a substance

14    containing fentanyl and 22.26 grams of a substance containing

15    fentanyl were tested?

16    A.   Yes.

17    Q.   Thank you.  Now I'll show you government's Exhibit 14B.

18    Does that certification relate to drug evidence sold by Juan

19    Rafael Tejada-Jiminez on February 14, 2018?

20    A.   Yes.

21    Q.   And does it indicate that the substance was 4.65 grams of

22    fentanyl?

23    A.   Correct.

24    Q.   And is there a second certification that's part of 14B?

25    A.   Yes.

1    Q.   And does that also relate to drug evidence seized from

2    Juan Rafael Tejada-Jiminez but on February 5th, 2018?

3    A.   Yes.

4    Q.   And does that indicate that 4.12 grams of fentanyl and

5    9.95 grams of fentanyl were tested?

6    A.   Yes.

7    Q.   Thank you.

8          THE COURT:   Counsel, I know you're just trying to be

9    efficient, and I appreciate that, but why don't we lead the

10   witness a little less.  Why don't you let the witness testify.

11   I realize you're trying to save time.

12   Q.   Let me show you Government's Exhibit 14C.  In the upper

13   right-hand corner of that document does that indicate from whom

14   the drugs were seized?

15   A.   Yes.

16   Q.   And who?  Who were they seized from?

17   A.   Norman Limoges.

18   Q.   And does it give the date those drugs were seized?

19   A.   It has a date of April 17th, 2018, but I think that's when

20   the date it was tested.

21   Q.   But these were drugs seized from Norman Limoges?

22   A.   Yes.

23   Q.   And what does it indicate the substance was tested for?

24   A.   It was tested for fentanyl.

25   Q.   Was it positive?

1    A.    Yes.

2    Q.    And what weight is listed there on that document?

3    A.    The total weight of chunk material contained in seven bags

4    was determined to be 35.2, plus or minus 1.2 grams; and then

5    140 plastic bags, each containing brown chunks, and that

6    weighed -- contains 140 bags.  The way it's expressed, 95.45

7    percent.

8    Q.    Okay.  Thank you.  Government's Exhibit 14D.

9    A.    Yeah.

10   Q.    Does that indicate from whom the drugs tested here were

11   seized from?

12   A.    Yes.

13   Q.    And who was that?

14   A.    Alicia Morin and Tara Deville (ph).

15   Q.    And did the substance seized test positive for fentanyl?

16   A.    Yes.

17   Q.    And does it provide weights for the drugs that were

18   seized?

19   A.    I just have to read it.  It was determined to be 4.509

20   plus or minus 0.070 grams.

21         THE COURT:  We don't need the margin of error.  Let's

22   just go.  Why don't you read them.

23   Q.    And I'm looking at Government's Exhibit 14E.  Who were

24   those drugs seized from?

25   A.    Darlene Tirone.

1    Q.   And was the substance there tested positive for fentanyl?

2    A.   Yes.

3    Q.   And was the weight 34.13 grams of fentanyl and 10.09 grams

4    of fentanyl?

5    A.   Yes.

6    Q.   Turning to Government's 14F, does that relate to drugs

7    seized from Amy Reardon?

8    A.   Yes.

9    Q.   And were the drugs seized fentanyl?

10   A.   Yes.

11   Q.   And were the weights 79.3 grams of fentanyl and 64.1 grams

12   of fentanyl?

13   A.   Yes.

14   Q.   This is Government's Exhibit 14G.  Does this refer to the

15   drugs seized from Stevens Street?

16   A.   Yes.

17   Q.   And who were they seized from?

18   A.   Steven Lessard and Cassie Kowack (ph).

19   Q.   And does that document indicate that those drugs were

20   tested by the Mass. State Police Crime Lab and was 2,004 grams

21   of fentanyl and 94.94 grams of fentanyl?

22   A.   Yes.

23   Q.   Government's Exhibit 14H.  So, this relates to drugs

24   seized from what individual?

25   A.   Norman Torrey.

1    Q.   And did the drugs test positive by the Maine State Police

2    Lab for fentanyl?

3    A.   Yes.

4    Q.   Was the weights 59 grams of fentanyl and 40.29 grams of

5    fentanyl?

6    A.   Yes.

7    Q.   Now I'll turn to Government's Exhibit 14I.

8    A.   Yes.

9    Q.   Does this relate to evidence seized at 176 Park Street?

10   A.   Yes.

11   Q.   And there are several fentanyl exhibits on there, correct?

12   A.   Yes.

13   Q.   Was one 477.2 grams of fentanyl?

14   A.   Yes.

15   Q.   Was one 309 grams of -- I'm sorry -- 1,083 grams of

16   fentanyl?

17   A.   Yes.

18   Q.   Was one 1,953 -- 1,436 grams of fentanyl?

19   A.   I cannot see that number here.

20   Q.   So, this on here is 447 grams of fentanyl?

21   A.   Correct.

22   Q.   Okay.  And turning to the last one, which is Government's

23   14J, does this relate to drugs seized at Manchester Street?

24   A.   Yes.

25   Q.   And can you review that document and tell me the amounts

1    that were tested positive for fentanyl?

2    A.   They weighed 1,083, 1,436.1, 992.3 grams, 437.92 grams,

3    355.4 grams.

4    Q.   Okay.  Thank you.  And does this also relate to drugs

5    seized at 31 Manchester Street?

6    A.   Yes.

7    Q.   And can you just read the fentanyl weight from that

8    exhibit?

9    A.   231.4.

10   Q.   And does this also relate to drugs seized at 31 Manchester

11   Street?

12   A.   Yes.

13   Q.   And what's the weight of the tested fentanyl on that drug

14   certification?

15   A.   551.88 grams.

16   Q.   And now 14M, the last one, does this also relate to drugs

17   seized at 31 Manchester Street?

18   A.   Yes.

19   Q.   And what was the amount of fentanyl tested positively in

20   that certification?

21   A.   3,004.5 grams.

22            THE COURT:  Did you finish your drug certification,

23   Counsel?

24            MR. AFRAME:  Yes.

25            THE COURT:  All right.  We'll take the morning break,

1    then.  Yeah, we'll take the morning break now and then

2    reconvene in 15 minutes.  Charli.

3              THE CLERK:  Please rise for the jury.

4              (The jury exited the courtroom at 10:47 a.m.)

5              THE CLERK:  All rise for the Honorable Court.

6              MR. AFRAME:  Just one quick thing just to let you

7    know.

8              THE COURT:  Sure.

9              MR. AFRAME:  I misspoke as we did -- on the houses as

10   to a few of these, so I have to correct something that I spoke

11   incorrectly.

12             THE COURT:  Okay, sure.

13             THE CLERK:  Please remain standing for the jury.

14             (The jury entered the courtroom at 11:06 a.m.)

15             THE CLERK:  Please be seated.

16             THE COURT:  You're still under oath.

17   BY MR. AFRAME:

18   Q.   Before the break, in my effort to be efficient I was

19   unfortunately sloppy here for a minute, so I want to clarify

20   something about these certifications.  So, if you could look at

21   the certifications that are marked as 14I, J, A, and L.

22   A.   Yes.

23   Q.   Before the break I identified those as drugs seized from

24   Manchester Street.  Is it, in fact, correct that those were

25   drugs seized from 176 Park Street?

1    A.    Yes.

2    Q.    And Government's 14M, does that certification refer to the

3    drugs that were seized from 31 Manchester Street?

4    A.    Yes.

5    Q.    Thank you.

6          MR. AFRAME:  I apologize for that.

7    Q.    So, let me ask you about what you did.  So, you were a

8    case agent.  We already heard Mr. Molloy testify what a case

9    agent does, and he talked about a search team that he ran for

10   Water Street.

11   A.    Yes.

12   Q.    Were you also the lead of a search team?

13   A.    Yes, I was.

14   Q.    And where did you conduct your search?

15   A.    22 Morton Street in Lawrence, Mass.

16   Q.    And can you tell us -- and so what date did that occur?

17   A.    April 9, 2018.

18   Q.    And, by the way, are you an English and a Spanish speaker?

19   A.    Yes.  My second language is Spanish -- well, English is my

20   second language.  My primary language is Spanish.  I'm from the

21   Dominican Republic, born and raised over there.

22   Q.    And you searched Morton Street?

23   A.    Yes.

24   Q.    And who lived in Morton Street?

25   A.    Mr. Martinez with his wife, Stephanie De Martinez as well

1    as his kids and his parents, Juana De Martinez and Juvenal De

2    Martinez.

3    Q.   And when you entered how did you make -- what time of day

4    did you make entry to Morton Street?

5    A.   It was early in the morning, approximately 6:00 a.m.

6    Q.   And just tell us what happened?

7    A.   We had a search team comprised from DEA agents as well as

8    State Troopers from Massachusetts and New Hampshire.  We had a

9    federal search warrant and arrest warrant for Sergio Martinez

10   and his wife Stephanie De Martinez.  We ended up making a

11   forced entry into the residence after a knock and announce.

12   Once we proceeded inside the residence, we ended up locating

13   Mr. Martinez and his wife in the first floor in the middle

14   bedroom next to the dining room area.

15   Q.   Okay.  And did you talk to Mr. Martinez?

16   A.   Yes.  Upon entry, we first made contact with Stephanie,

17   which was in bed with her son.  We couldn't find Mr. Martinez

18   for a few seconds.  Subsequently, Mr. Martinez was found hiding

19   behind the bedroom door of that same bedroom.

20   Q.   Did you speak to him in Spanish or English that day?

21   A.   Both.  I ended up giving him instructions due to we needed

22   to apprehend him.  Mr. Martinez was not cooperating, refusing

23   to follow our instructions or my instructions, and I was giving

24   him directions in English and Spanish so we can effect the

25   arrest.

1    Q.   Okay.  And what else happened with Mr. Martinez shortly

2    after --

3    A.   Shortly after, Mr. Martinez appeared to be scared, which

4    is completely understandable, since we have a bunch of law

5    enforcement coming into this residence.  In the process of not

6    cooperating he ended up dropping to the floor and ended up

7    appearing that he was having some type of a medical issue.  I

8    then inquire with Luz (ph), which is his wife, Stephanie, if

9    there was something wrong with him.  Stephanie advised me that

10   he was a diabetic and he didn't have any medication.  I then

11   inquired with Mr. Martinez if he had any medication.  He didn't

12   answer me.  He then appeared to pass out.  I checked his vital

13   signs.  He was breathing.  He just, based on my opinion, he

14   just seemed that he was just not cooperating.

15   Q.   So, what happened after that?

16   A.   We ended up giving him orange juice, and then he ended up

17   waking up, tried to get away from us by walking away from

18   officers, and he was apprehended, placed in handcuffs.

19   Q.   Okay.  Now, let me show you Government's Exhibit 12A.  You

20   made entry at 6:00 in the morning?

21   A.   Yes.

22   Q.   Do you recognize Government's Exhibit 12A?

23   A.   I do.

24   Q.   And what is that, Mr. Infante?

25   A.   This is a Rolex watch that was found on Mr. Martinez's

1    left wrist when we make entry into the residence.

2    Q.   So, he was wearing that?

3    A.   He was wearing that, yes.

4    Q.   What else was he wearing?

5    A.   He was wearing a gold chain around his neck, and he was in

6    his boxers.  Appeared that he just woke up.

7    Q.   So, let me ask you about some of the other items that were

8    seized.  Let's look at Government's Exhibit 2017.  Do you

9    recognize that, Mr. Infante?

10   A.   Yes.

11   Q.   What is that?

12   A.   This is the rear photo of the front door of 22 Morton

13   Street.

14   Q.   And on the side of what looks like a normal door I see

15   some silver things next to the moldings.  What are those?

16   A.   Those are used to reinforce the door by placing a

17   2 by 4 through them.

18   Q.   Now, when you entered was the door locked with the 2 by 4?

19   A.   Through the front door I don't recall, because I entered

20   through the back of the residence, but we had officers in the

21   front of the residence.  So, no entry was made through the

22   front door.

23   Q.   And let's look at Government's Exhibit 2018.

24   A.   Yes.

25   Q.   What is that?

1    A.    That is a large box full of U.S. currency, which was

2    located on the first floor in the rear pink bedroom, like the

3    kid's bedroom.

4    Q.    It was on the floor?

5    A.    Yes.

6    Q.    And let's look at Government's Exhibit 2019.

7    A.    Yeah.

8    Q.    It looks like we're in a closet, and I'm going to point

9    your attention to the red bag in front of the truck.  Can you

10   just point that out to the jury.

11   A.    (Indicating).

12   Q.    So, where was this closet?

13   A.    That was located on the first floor pink bedroom rear, the

14   kid's room in the first floor.

15   Q.    Looking at that picture of the red bag, what's sticking

16   out to the bottom, my right-hand side?

17   A.    U.S. currency.

18   Q.    And if we look at Government's Exhibit 2020, is that the

19   same red bag?

20   A.    Yes.

21   Q.    And when it was opened what was inside?

22   A.    U.S. currency.

23   Q.    Thank you.  Now we have here this item (indicating)?

24   A.    Yup.

25   Q.    Is this item the same thing that's in the box?

1    A.    Yes.

2    Q.    And do you know what this item is?

3    A.    That is an automatic money counter machine.

4    Q.    And did you locate -- where were these located?

5    A.    The two in the boxes were located in the kid's room in the

6    first floor, in the pink room.  The one that appears to be used

7    or is not in the box was located in Mr. Martinez's bedroom on

8    the first floor.

9    Q.    And Government's Exhibit 2022, do you recognize that?

10   A.    Yes, I do.

11   Q.    And what is that?

12   A.    That is a Massachusetts driver's license belonging to

13   Sergio Martinez.

14   Q.    And where was that found?

15   A.    That was located in Mr. Martinez's bedroom on the first

16   floor.

17   Q.    And, finally, this is Government's Exhibit 2023.  Do you

18   recognize what is this box?  Let me open this box --

19   A.    Sure.

20   Q.    -- to see if you recognize what's inside.

21                          (Pause)

22   Q.    Like every good gift, it's a box inside a box.  Can you

23   now open up and show us what's in that box?

24   A.    Yes.  (Indicating).

25   Q.    And so, what are these?

1    A.    Those are red sandwich bags.

2    Q.    And what's this box filled with?

3    A.    More small boxes of red sandwich bags, it appears.

4    Q.    And there are several in this big box?

5    A.    Yes.

6    Q.    Thank you.  Exercise for the day.

7          All right.  And Government's Exhibit 2037, a cell

8    phone.  Was this acquired -- looking at the sticker, was this

9    acquired by you?

10   A.    Yes.

11   Q.    And did you find a cell phone that ended in 0001 in the

12   Martinez residence?

13   A.    I did.

14   Q.    And how did you know that the cell phone was 0001?

15   A.    It was located in the bedroom of the first floor at 22

16   Morton Street where Mr. Martinez was located, and the way I

17   confirmed it was by placing a phone call into the triple-zero-1

18   number, and the phone rang.

19   Q.    Okay.  And that was Government's Exhibit 2037.

20         All right.  So, the last thing I want to do now is

21   play a series -- actually, one more thing before we do that.

22         We saw a lot of money that was seized in the search?

23   A.    Yes.

24   Q.    How was it counted?

25   A.    The money was eventually counted officially at Loomis,

1    Londonderry, New Hampshire.

2    Q.   And were you present when they did that?

3    A.   Yes.

4    Q.   And do you know what the count was for the money from the

5    Martinez -- from the Morton Street search?

6    A.   From the Morton Street it was a total of $133,434.

7    Q.   And was the same count, was a money count done at the same

8    time for the money that was found at Water Street?

9    A.   Yes.

10   Q.   That's the search that Mr. Molloy testified about

11   yesterday?

12   A.   Yes.

13   Q.   And how much was found at Water Street?

14   A.   That one, the official count was $54,170.

15   Q.   And we also heard testimony that approximately $400,000

16   was seized from Mr. Martinez's car as he traveled to New

17   York --

18   A.   Yes.

19   Q.   -- on February 25th to 6th?

20   A.   Yes.

21   Q.   Was that also counted?

22   A.   It was counted.

23   Q.   And what was the exact count for that?

24   A.   It was also officially counted at Loomis, and that was

25   $400,494.

70

1   Q.   Thank you.  Now, the last thing I would like to do with

2   you is to play a series of telephone calls.  Now, let's start

3   with 5/18.  And did you listen to this call prior to trial?

4   A.   Yes.

5   Q.   And was Mr. Martinez's voice -- does the left-hand column

6   correctly identify Mr. Martinez?

7   A.   Yes.

8   Q.   Thank you.  If we can play Government's 518.

9                    (Audio recording played)

10  Q.   Do you know at the end of March, this is March 26th, 2018

11  at 2:00 p.m., from travel records do you know where Sergio

12  Martinez was at that time?

13  A.   Heading to the Dominican Republic.

14  Q.   Let's turn now to 1101.  And, again, did you listen to

15  this call?

16  A.   Yes.

17  Q.   And was Sergio Martinez's voice correctly identified?

18  A.   Yes.

19  Q.   And "UF," does that just stand for -- "UF4648," does that

20  just mean Unidentified Female and the last four digits of the

21  phone number?

22  A.   Correct.

23  Q.   Thank you.

24                    (Audio recording played)

25  Q.   Turning to Government's 1102, again, did you identify the

1    voice of Sergio Martinez on this call?

2    A.    Yes.

3    Q.    Do you know Jimmy, or does it just say "Jimmy" because he

4    identifies himself in the call as "Jimmy"?

5    A.    Because he was identified in the call.  I don't know a

6    Jimmy.

7    Q.    Okay.  Thank you.

8                        (Audio recording played)

9    Q.    And do you know which telephone this was intercepted from?

10   A.    This specific call I believe was the 6702, 224.

11   Q.    Is that what we've either called the big phone or the

12   silver phone?

13   A.    Yes.

14   Q.    And now 11:03.  Do you recognize the Sergio Martinez voice

15   at the places marked on the transcript?

16   A.    Yes.

17                        (Audio recording played)

18   Q.    Government's 104 -- 1104.  Again, did you recognize the

19   voices in this call belonging to Mr. Martinez where it's so

20   marked on the transcript?

21   A.    Yes.

22                        (Audio recording played)

23   Q.    Government's Exhibit 105 -- 1105.  Again, have you

24   listened to this call?

25   A.    Yes.

1    Q.   And is Sergio Martinez correctly identified as the speaker

2    on the transcript?

3    A.   Yes.

4    Q.   Thank you.

5                     (Audio recording played)

6    Q.   Based on surveillance that was done in this case, is that

7    accurate in the sense that we've heard about certain customers

8    where a taxi would deliver drugs to them, but other than that

9    would the runners move to meet the customers based on the

10   surveillance that was done?

11   A.    No.  Most of the runners worked in specific streets in the

12   Lawrence area.  They might move a couple of houses up and down,

13   but they would stay within the street.  After serving customers

14   they would either move to another street if they feel that that

15   street is hot.

16   Q.   Okay.  Government's Exhibit 1106.  Again, does this

17   transcript correctly identify Mr. Martinez as the speaker?

18   A.   Yes.

19                     (Audio recording played)

20   Q.   Government's Exhibit 1107.  Again, when you listened to

21   this call you verified the voice as Mr. Martinez's?

22   A.   Yes

23                     (Audio recording played)

24   Q.   Government's Exhibit 1108.  Did you review that call

25   before, when we met in my office?

1   A.   Yes.

2   Q.   And when you listened to it, did the voices comport with

3   that transcript?

4   A.   Yes.

5   Q.   Okay.  Thank you.  So, if you do want to follow along, it

6   will be 1108A.

7                  (Audio recording played)

8   Q.   1109.  Mr. Infante, did you listen to this call before, in

9   my office?

10   A.   Yes.

11   Q.   And is Mr. Martinez's voice accurately identified in the

12   transcript?

13   A.   Yes.

14                  (Audio recording played)

15   Q.   1110.  And, again, are you familiar with this call?

16   A.   Yes.

17   Q.   And is the voice of Mr. Martinez correctly identified in

18   the transcript?

19   A.   Yes.

20                  (Audio recording played)

21   Q.   They are referring to a guy getting busted in Salem, New

22   Hampshire.  Do you know who that is?

23   A.   Yes.

24   Q.   Who is that?

25   A.   It's Rafael Tejada, a/k/a "Rafi."

1   Q.   1111.  Again, so this call identifies the same

2   unidentified male as the prior call, and was Sergio Martinez

3   the other speaker in this call?

4   A.   Yes.

5                    (Audio recording played)

6   Q.   Have you heard the phrase "smoking" before?

7   A.   Yes.

8   Q.   What does that mean?

9   A.   In these terms it means the police will arrest you and

10  prosecute you.

11  Q.   1112.  Again, so here did you listen to the voices?

12  A.   Yes.

13  Q.   And was this Raulin Martinez?

14  A.   Yes.

15                   (Audio recording played)

16  Q.   1113A.  And do you recognize this call?

17  A.   Yes.

18  Q.   Is Sergio Martinez's voice identified correctly?

19  A.   Yes.

20  Q.   Okay.

21                   (Audio recording played)

22  Q.   And 1114.  Did you listen to this call in my office?

23  A.   Yes.

24  Q.   And do the "SM" designations on the speaker column

25  correctly identify Mr. Martinez's voice?

1    A.    Yes.

2                    (Audio recording played)

3    Q.    1115.  And, again, do the SM designations, based on your

4    listening to the call, correctly identify Mr. Martinez as the

5    speaker?

6    A.    Yes.

7                    (Audio recording played)

8    Q.    1116.  So, 1116A.  No, 1116.  And so, you've told us

9    already, Mr. Infante, that you speak Spanish, correct?

10   A.    Yes.

11   Q.    And was this call in Spanish?

12   A.    Yes.

13   Q.    And on the speaker column the designations are "RM" and

14   "SM"?

15   A.    Mm-hmm.

16   Q.    Do the "RM" column designations correctly reflect Raul

17   Martinez?

18   A.    Yes.

19   Q.    Do the "SM" columns correctly represent Sergio Martinez's

20   voice.

21   A.    Yes.

22   (FOLLOWING IS A READING OF THE TRANSCRIPT AS READ BY ATTORNEY

23   AFRAME AND ATTORNEY KONESKY):

24             MS. KONESKY:  Talk to me.

25             MR. AFRAME:  How much money was it that you gave?

1               MS. KONESKY:  Three forty.

2               MR. AFRAME:  Well, there wasn't three forty there.

3               MS. KONESKY:  And what is it that they say there was?

4               MR. AFRAME:  No.  They counted it in front of me and

5     in front of this guy.  This guy counted it.

6               MS. KONESKY:  And what do they claim was there?

7               MR. AFRAME:  There is 331.

8               MS. KONESKY:  No, no.  Are you crazy or what?  No, no,

9     no.  Not true.

10               MR. AFRAME:  They counted it in front of me.

11               MS. KONESKY:  Not true, because I counted it.  There

12     were 100,000, but there were 100,000 bucks in hundreds, and

13     there were 24 in 20, 20, 24 packages of hundreds.

14               MR. AFRAME:  20, 20, 20.

15               MS. KONESKY:  In 10s.

16               MR. AFRAME:  In hundreds.  There were only 23.

17               MS. KONESKY:  No, no, no, no.

18               MR. AFRAME:  In tens.

19               MS. KONESKY:  No, because I counted them before --

20     before you left.

21               MR. AFRAME:  In 20s, in 20s.

22               MS. KONESKY:  There were 50s.  There was one, a

23     package of 50s.

24               MR. AFRAME:  There were 23 packages, 23 packages and

25     hundreds, hundred.

1          MS. KONESKY:  No way, no way, because I know what I

2    put in there.

3          MR. AFRAME:  And you put, like, a couple of fives?

4          MS. KONESKY:  No.  Mine -- there were no fives either.

5          MR. AFRAME:  There were fives.  So, you know, I have

6    video here when they uncovered it.

7          MS. KONESKY:  There wasn't.  No, there wasn't.  Fool.

8    Not true.  That's not true.  Then, well, they stole 9,000

9    bucks, they stole it.  That is not true.  Look, that -- that is

10   not true because the money was --

11         MR. AFRAME:  They counted it for me, too.  I counted

12   mine with 8,000 bucks.

13         MS. KONESKY:  No, no.  Well that is not true, then.

14   When -- where are they -- are they going to charge you a

15   percentage and on top of that they're going to steal more than

16   1,000 bucks?  That is just a simple lie, because, because my

17   money was properly counted.  24 packages of tens, that is, that

18   is 200, 220, 200, 240,000 bucks.

19         MR. AFRAME:  In 10s.  No, no, 20s.  There were only 23

20   packages.  They counted it in front of me.

21         MS. KONESKY:  Fool.  But I had it, fool.  I was the

22   one who counted it.  I had 24, because 24 packages of 10, which

23   makes 240 plus the 100.  It was complete, they were complete,

24   because before -- because -- because before you left I sat in

25   here and counted it, and the 100,000 bucks were there.  Now

1    what?

2                    (End of reading of the transcript)

3    BY MR. AFRAME:

4    Q.   1117.  Again, this was a Spanish call.  Did you listen to

5    it in Spanish?

6    A.   Yes.

7    Q.   And did you identify Mr. Martinez's voice?

8    A.   Yes.

9    (FOLLOWING IS A READING OF THE TRANSCRIPT AS READ BY ATTORNEY

10   AFRAME AND ATTORNEY KONESKY):

11            MR. AFRAME:  The thing is, I don't know what you're

12   doing at a factory busting yourself for fucking 200, 300 bucks

13   for nothing, when you can get that in a flash.

14            MS. KONESKY:  You can imagine that this is what I've

15   been --

16            MR. AFRAME:  What you make there in one we- -- in

17   almost two weeks you make it here in one week, one day.

18            MS. KONESKY:  Yes, I know.  Yes, I know.  No, that,

19   man, I'm going to chuck that other thing.

20            MR. AFRAME:  Two weeks.

21            MS. KONESKY:  Right.

22            MR. AFRAME:  Two weeks at the factory and you make it

23   in three hours here, taking care, and it's done.

24            MS. KONESKY:  Yes, yes.  No.  I already --

25                    (End of reading of the transcript)

1    BY MR. AFRAME:

2    Q.   Government's Exhibit 118 -- sorry.  119.  Excuse me.

3    1119.  And was this call in Spanish?

4    A.   Yes.

5    Q.   And did you listen to the voices?

6    A.   Yes.

7    Q.   And are the Raul Martinezes correct in the speaker column?

8    A.   Yes.

9    Q.   And are the Sergio Martinez designations correct?

10   A.   Yes.

11   (FOLLOWING IS A READING OF THE TRANSCRIPT AS READ BY ATTORNEY

12   AFRAME AND ATTORNEY KONESKY):

13             MS. KONESKY:  Hello.

14             MR. AFRAME:  The big phone.  Who is taking care of the

15   calls, Dude?

16             MS. KONESKY:  What?

17             MR. AFRAME:  The big calls.

18             MS. KONESKY:  Who is the one taking care of them?

19             MR. AFRAME:  Yes.

20             MS. KONESKY:  Send to Vermont.

21             MR. AFRAME:  No.  It's not him.

22             MS. KONESKY:  Vermont is the one that that is there.

23   He said he's about to finish soon.

24             MR. AFRAME:  Fine.  So that --

25             MS. KONESKY:  Vermont and what's that?  Vermont and

1    Rafi are the ones that are there.  Uh, Vermont has sold like,

2    like almost 300, one of 140 and stuff.

3            MR. AFRAME:  But had he finished what he had sold

4    yesterday?  He -- he had sold 170 yesterday.

5            MS. KONESKY:  No, but he didn't finish.  But today,

6    today he has sold -- it was one of 100 and another 140.  Now he

7    has 140 and he has two bags.

8            MR. AFRAME:  And Rafi, where about is he?

9            MS. KONESKY:  The one that finished yesterday, the one

10   that finished yesterday was Rafi.

11                 (End of reading of the transcript)

12   BY MR. AFRAME:

13   Q.   And do you know did the individual known as Rafi testify

14   at the trial?

15   A.   Yes.

16   Q.   And who is that?

17   A.   Rafael Tejada.

18   Q.   1120 again.  Was this a Spanish call?

19   A.   Yes.

20   Q.   And are the Sergio Martinez designations in the speaker

21   column correct based on what you heard?

22   A.   Yes.

23   (FOLLOWING IS A READING OF THE TRANSCRIPT AS READ BY ATTORNEY

24   AFRAME AND ATTORNEY KONESKY):

25            MS. KONESKY:  But are you going to prepare soon?

1          MR. AFRAME:  Huh?

2          MS. KONESKY:  Uh, are you going soon, to already pack

3     soon?

4          MR. AFRAME:  We are working.

5          MS. KONESKY:  Uh, so take us there already today.

6          MR. AFRAME:  No.  If you want to come, come over here

7     and like that.  You understand?  One does not work here all the

8     time.  We here, uh, for instance today and one come, comes back

9     in 10 or 12 days.  After, in 10, 12 and one is coming to do

10    from 10 to 12.

11         MS. KONESKY:  When do you start again?

12         MR. AFRAME:  You know -- no, they are already starting

13    mixing it.  They are -- and stuff.  They are going to start

14    pack -- packing and stuff.

15         MS. KONESKY:  So, I will get the training the --

16         MR. AFRAME:  You understand?

17         MS. KONESKY:  -- then because --

18         MR. AFRAME:  I'm here at Park.

19         MS. KONESKY:  But I don't know where it is.

20         MR. AFRAME:  Yes, yes, at 176.

21         MS. KONESKY:  Uh, okay.  All right.

22         MR. AFRAME:  So, we'll see you.

23         MS. KONESKY:  So, all right.

24         MR. AFRAME:  There.  Look for the number, the 176.  If

25    not me still -- right away.

1          MS. KONESKY:  Okay.  Yes.  All right.

2              (End of reading of the transcript)

3     BY MR. AFRAME:

4     Q.   And the last one, 1122.  And, again, did you listen to

5     this call in Spanish?

6     A.   Yes.

7     Q.   And do the SM designations represent Sergio Martinez's

8     voice correctly?

9     A.   Yes.

10    (FOLLOWING IS A READING OF THE TRANSCRIPT AS READ BY ATTORNEY

11    AFRAME AND ATTORNEY KONESKY):

12         MR. AFRAME:  I just tell them I don't care if they

13    want to go to jail, go to jail.  The ones who are going to be

14    locked up there at Middleton are they?

15         MS. KONESKY:  Of course.

16         MR. AFRAME:  I tell them so they can take care of

17    themselves, but if they don't want to take care of themselves

18    unfortunately, I'm sorry.

19         MS. KONESKY:  No, the thing is that I do.  I tell them

20    I find streets for them, because I live -- I live around the

21    corner and stuff.  I live --

22         MR. AFRAME:  Why don't they stay in Haverhill, man?

23    Whoever stays in Haverhill doesn't go to jail.  In Haverhill.

24    The only thing is that you can't linger.  Haverhill's a bit

25    cooler --

1          MS. KONESKY:  That --

2          MR. AFRAME:  -- than Lawrence.

3          MS. KONESKY:  That's what I tell them.  That's what I

4     tell them, and better in that little street.

5          MR. AFRAME:  And the clients, the --

6          MS. KONESKY:  Have you -- have you gone in there?

7          MR. AFRAME:  Clients don't want to go into Lawrence

8     anymore.  If you don't have Lawrence, there's Haverhill right

9     there, because they come down right from over there, from

10    Plaistow, from Hampton.

11         MS. KONESKY:  Uh-huh.

12         MR. AFRAME:  From all those places down there.

13         MS. KONESKY:  That's true.

14         MR. AFRAME:  And it's cooler than -- remember, New

15    Hampshire plates.  Plaistow is right there, right there, and

16    they can't, they can't complain.

17         MS. KONESKY:  That is true.

18         MR. AFRAME:  But here in Lawrence you're in jail.

19              (End of reading of the transcript)

20    BY MR. AFRAME:

21    Q.   No further questions, Trooper Infante.

22    A.   Thank you.

23         THE COURT:  Cross.  Actually.  Since we're going to

24    1:00, let's take a little break.  Probably about 45 minutes of

25    cross or whatever you need.  We're in recess.

1          THE CLERK:  All rise.

2          (Recess taken from 12:04 p.m. to 12:19 p.m.)

3          THE CLERK:  Please be seated.

4                     CROSS-EXAMINATION

5  BY MR. SHEKETOFF:

6  Q.   Good afternoon, Trooper Infante.

7  A.   Good afternoon, sir.

8          THE COURT:  You're still under oath.

9          THE WITNESS:  Thank you, your Honor.

10  Q.   Sir, you were involved with this investigation from the

11  beginning; is that fair to say?

12  A.   Yes, sir.

13  Q.   And you know all the people that were arrested in

14  connection with this case?

15  A.   Yes.

16  Q.   You know their names, you know what they were charged

17  with?

18  A.   Yes.

19  Q.   I mean, I might be able to trick you with one or two, but

20  basically you know them all, correct?

21  A.   Yes, sir.

22  Q.   And Raulin or Raul Martinez you understand to be my

23  client's brother?

24  A.   Yes.

25  Q.   And he was arrested?

1    A.   Yes.

2    Q.   Also on April 9th?

3    A.   Yes.

4    Q.   Of 2018?

5    A.   Yes.

6    Q.   And he pled guilty to the 400 kilo -- I mean the 400-gram

7    conspiracy charge?

8    A.   I believe so.

9    Q.   He was never charged with a CCE, was he?

10   A.   No.

11   Q.   And Alfredo Martinez has never been charged with anything;

12   is that fair to say?

13   A.   Correct.

14   Q.   Did Raulin Martinez reach a plea agreement with the

15   government that included cooperation?

16   A.   I believe so.

17   Q.   And was he on the government's witness list?

18   A.   Yes.

19   Q.   Do you know of your own personal knowledge whether the

20   government is going to call him as a witness in this case?

21   A.   I don't know.

22   Q.   Now, you testified about two phone calls between Raulin

23   Martinez and Sergio Martinez where you said you recognized

24   their voices, correct?

25   A.   Yes.

86

1    Q.    During the course of the wiretap, the 90 days or so that

2    it was up, how many phone calls between those two brothers were

3    intercepted, approximately?

4    A.    I want to say over 40.

5    Q.    40 or so?

6    A.    Approximately, yeah.  I don't know the exact amount.  40

7    or 50.

8    Q.    Okay.  But in that vicinity?

9    A.    More or less.

10    Q.    So, they weren't talking to each other once a day on the

11    phone, at least.  A little less than once a day, maybe once

12    every two days?

13    A.    Possibly.

14    Q.    I'm just asking for your best estimate.

15    A.    Okay.  I would say at least once a day or twice a day,

16    maybe.

17    Q.    And how many interceptions of Alfredo Martinez occurred?

18    A.    None.

19    Q.    Not a single one?

20    A.    Due to the wire I don't recall an intercept with Alfredo

21    Martinez.

22    Q.    Now, the two calls that were picked out, did you

23    participate in deciding which two calls would be picked out

24    between Raulin Martinez and Sergio Martinez?

25    A.    No.

1    Q.    That was somebody else's decision?

2    A.    For this trial?

3    Q.    For trial.

4    A.    Yes.

5    Q.    All right.  I'd like to talk about that first call a

6    little bit, where the two brothers are talking about some

7    relatively large sum of money?

8    A.    Yes.

9    Q.    And Raulin Martinez is saying to Sergio Martinez words to

10   the effect of, I counted that money before I sent you with that

11   money or before you left with that money?

12   A.    Yes.

13   Q.    And Sergio Martinez is saying something like, They're

14   counting it in front of me, and it's short?

15   A.    Yes.

16   Q.    And Raulin replies, Basically, I counted it.  It's not

17   short?

18   A.    Correct.

19   Q.    Okay.  And Raulin calls Sergio a fool during the course of

20   that conversation?

21   A.    Yes.

22   Q.    Okay.  Now, did you ever try out either of those two money

23   counting machines that you found on Morton Street?

24   A.    Can you repeat the question?  I'm sorry.

25   Q.    Yeah.  Did you ever try either of those two money counting

1   machines?

2   A.    No.

3   Q.    You don't know how they work?  In other words, do you know

4   whether you have to separate the bills in order to count them

5   on that machine?

6   A.    I'm not familiar with the machine.

7   Q.    Okay.  You've never used a money-counting machine?

8   A.    Unfortunately not.

9           MR. SHEKETOFF:  Thank you, sir.

10          THE COURT:  Any redirect?

11          MR. AFRAME:  No, your Honor.

12          THE COURT:  Trooper, you may step down.

13          THE WITNESS:  Thank you, your Honor.

14                    (Witness stepped down)

15          MR. AFRAME:  The United States calls Eduard Amparo.

16          THE CLERK:  The Court reminds the interpreter you're

17   still under oath.

18          THE INTERPRETER:  Yes.

19          THE CLERK:  If you could carefully step into the

20   witness box and remain standing.

21          **EDUARD AMPARO,** having been duly sworn by the Clerk,

22   was examined and testified through the interpreter as follows:

23          THE CLERK:  Please state your full name, spelling your

24   last.

25          THE WITNESS:  Eduard Amparo, A-m-p-a-r-o.

```
1            THE CLERK:  Please be seated.

2                      DIRECT EXAMINATION

3    BY MR. AFRAME:

4    Q.   Good afternoon, Mr. Amparo.

5    A.   Good afternoon.

6    Q.   How old are you, sir?

7    A.   More or less.

8    Q.   How old are you, sir?

9    A.   Forty-seven years old.

10   Q.   And where were you born?

11   A.   In the Dominican Republic.

12   Q.   And are you presently married?

13   A.   Yes, but we're separated.

14   Q.   And do you have a girlfriend?

15   A.   That is correct.

16   Q.   And do you have children?

17   A.   Yes.

18   Q.   And what are their age ranges?

19   A.   The youngest, she's three years old.  The oldest is 26.

20   Q.   And when did you first come to the United States for the

21   first time?

22   A.   Early '90s, in '93.

23   Q.   And when you came in the early '90s, did you come legally

24   or illegally?

25   A.   Illegally.
```

90

1    Q.   And when you came illegally in the early '90s, where did

2    you live in the United States?

3    A.   In Massachusetts.

4    Q.   And when you were in Massachusetts in the early '90s did

5    you engage in drug trafficking?

6    A.   That is correct.

7    Q.   And were you arrested and charged with drug trafficking?

8    A.   That is correct.

9    Q.   And what kind of drug were you trafficking?

10   A.   Cocaine.

11   Q.   And did you go to trial?

12   A.   Yes.

13   Q.   What happened in that trial?

14   A.   I lost the trial.  They found me guilty.

15   Q.   And did you go to jail in Massachusetts?

16   A.   That is correct.

17   Q.   And how long were you in jail for?

18   A.   Seventeen years.

19   Q.   And when you finished that sentence, what happened?

20   A.   I was transferred to a federal jail for immigration.

21   Q.   And then what?

22   A.   And then -- and I was deported afterwards.

23   Q.   And deported to where?

24   A.   To my country.

25   Q.   And about what year were you sent back to the Dominican

1   Republic?

2   A.   2011.

3   Q.   Now, you've told us about this 1994 conviction.  I see

4   that you're wearing prison clothing today.  Are you living in

5   jail now?

6   A.   Yes.

7   Q.   And do you have another drug-related conviction?

8   A.   That is correct.

9   Q.   And is that related to this case?

10  A.   That is correct.

11  Q.   And what's the charge to which you -- have you pled guilty

12  to that charge?

13  A.   Yes.

14  Q.   And what is the charge that you pled guilty to?

15  A.   Conspiracy and conspiracy with intent to distribute and

16  possession.

17  Q.   And distribute what?

18  A.   Fentanyl.

19  Q.   And do you know what quantity you've pled guilty to

20  conspiring to distribute?

21  A.   400 grams and more.

22  Q.   And do you know right now what you're facing for a minimum

23  sentence?

24  A.   Fifteen years.

25  Q.   And do you know the maximum that you're facing?

92

1   A.   Life.

2   Q.   And are you testifying today as part of a cooperation

3   agreement with the government?

4   A.   That is correct.

5   Q.   And do you hope that by cooperating you're going to end up

6   with a lesser sentence than you otherwise would have?

7   A.   That is correct.

8   Q.   Has any promise been made to you about what sentence

9   you'll ultimately receive?

10  A.   Not yet.

11  Q.   And who is going to decide, ultimately, your sentence?

12  A.   To my understanding, it will be the judge.

13  Q.   And do you have any deal arrangements with the judge?

14  A.   No.

15  Q.   What are you hoping that the United States Attorneys will

16  do at your sentencing?

17  A.   Well, that they recommend a lower sentence.

18  Q.   And do you understand what you have to do if that were to

19  happen?  What's your responsibility?

20  A.   To tell the truth.  That's all.

21  Q.   And what happens if you do not tell the truth?

22  A.   Well, I would not receive any benefit in exchange; and

23  anything that I say that is not the truth could be used against

24  me.

25  Q.   Okay.  Now, let me turn to ask you if you know Sergio

1    Martinez.

2    A.    Yes.

3    Q.    And do you see him in the courtroom?

4    A.    Yes.

5    Q.    And where is he located?  Can you just identify him for us

6    by an article of clothing?

7    A.    Um, he's to my right.  I see that he's wearing a black

8    suit and a white shirt.

9    Q.    Thank you.  Now, how did you first meet Sergio Martinez?

10   A.    In the -- in the Dominican Republic.

11   Q.    What were the circumstances that brought you two to meet?

12   A.    Well, the truth is that he knows part of my family, and

13   one day a relative of mine introduced him to me.

14   Q.    And around what year was that?

15   A.    2016.

16   Q.    Did you discuss drug trafficking with him after you met?

17   A.    No, not at that same moment.  We did speak about drugs

18   afterwards but not at that time.

19   Q.    Okay.  How much later after you met him?

20   A.    I would say a month later.

21   Q.    And did you discuss with Mr. Martinez your history with

22   drug trafficking?

23   A.    He knew it.  He knew that I had previously been in prison

24   from my family.

25   Q.    And did you discuss with Mr. Martinez his drug business

1    back in the United States?

2    A.    We spoke of it, yes.

3    Q.    And, generally speaking, what did he describe as to what

4    he was doing in the United States?

5    A.    That he had a business of selling drugs here.

6    Q.    Were there any discussions in the Dominican about anything

7    you might do to help his organization?

8    A.    Well, I had in my plans to come back here to the United

9    States once again, well, and if I saw myself that I needed

10   work, well, if I could work with him.

11   Q.    Did you come back to the United States?

12   A.    That is correct.

13   Q.    In what year?

14   A.    2017.

15   Q.    And did you come this time legally or illegally?

16   A.    Illegally once again.

17   Q.    And how did you do that?  How did you make the trip from

18   the Dominican to the United States?

19   A.    A flight to Bahamas and from Bahamas to Miami in a boat.

20   Q.    And what did it cost you to do that?

21   A.    $20,000.

22   Q.    Now, when you came to the United States in 2017 where did

23   you go to live?

24   A.    To Lowell.

25   Q.    In what state?

1   A.   Massachusetts.

2   Q.   And did you have family there?

3   A.   Yes.

4   Q.   Who lived there?

5   A.   I have a daughter and a son.

6   Q.   Okay.  Now, when you came initially to the United States,

7   did you immediately ask Mr. Martinez for work?

8   A.   No, not immediately, because I started working at first.

9   Q.   And where did you work at first?

10   A.   In a convenience store in Lowell.

11   Q.   And how much did that pay you a week?

12   A.   When I started, $149 a week.  Afterwards, they gave me a

13   raise, a while after, up to $8.25 an hour, so I would earn 260.

14   Q.   Okay.  Was that sufficient money for you to live on?

15   A.   Of course not.

16   Q.   Did you reach out to Mr. Martinez about potential work?

17   A.   We spoke about work, yes.

18   Q.   What was the first potential -- did he offer you a job

19   within his organization?

20   A.   That is correct.

21   Q.   And what was that initial job that he offered you?

22   A.   To take care of customers, small customers.

23   Q.   And did you accept or decline that offer?

24   A.   I declined.

25   Q.   Why did you decline that offer, Mr. Amparo?

1   A.   Considering my past, and considering that I would have to

2   be out in the street looking at customers, I didn't want to

3   risk being out in the street and having people look at me.

4   Q.   Okay.  So, did you try to think of another way that you

5   could make money by helping Mr. Martinez?

6   A.   Uh, yes.

7   Q.   And what other way did you think of that you could

8   possibly help him?

9   A.   Well, at least trying to sell to him, me selling to him.

10  Q.   And what were you trying to sell?

11  A.   Fentanyl.

12  Q.   Did you have a connection within the United States where

13  you believed you could get fentanyl to sell to Mr. Martinez?

14  A.   Yes.

15  Q.   What was that connection?

16  A.   A connection I had in New York.

17  Q.   And who was -- did that person have a name?

18  A.   I knew him from a nickname.  They would call him

19  "Coquito."

20  Q.   Did you know his full name?

21  A.   No.  It was a nickname.

22  Q.   Thank you.  How were you connected to Coquito?  What was

23  the method by which you were introduced to this person?

24  A.   I have a friend in Santo Domingo.  He used to move in the

25  situation, in the drug business, and he used to know a lot of

1    people; and when I called him and told him about my situation

2    here in the United States I asked him if he knew someone here

3    in the States who I could contact.  So, he knew someone over

4    there who had a nephew over here.  That nephew was Coquito, and

5    he contacted me with him.

6    Q.   So, once you made your connection with Coquito, did you

7    make attempts to try to sell fentanyl to Mr. Martinez on

8    multiple occasions?

9    A.   That is correct.

10   Q.   And how many times, roughly, do you think you tried to

11   sell fentanyl to Mr. Martinez?

12   A.   I couldn't tell you exactly how many times, but several

13   times.

14   Q.   Okay.  How many times were you successful in selling to

15   Mr. Martinez?

16   A.   Only once.

17   Q.   Now, can you describe to us the process by which you would

18   obtain the drugs from New York and bring them back to

19   Mr. Martinez?

20   A.   Well, when Coquito would call me and tell me that he had

21   something, I would go to New York.  He would give me whatever

22   he had, and I would bring it here.

23   Q.   And would you drive yourself?

24   A.   No.

25   Q.   How would you go?

1    A.    In a bus.

2    Q.    Would you come back in a bus?

3    A.    That is correct.

4    Q.    And how would you conceal the drugs while you were on the

5    bus?

6    A.    I would take a suitcase with clothes with me.  I would put

7    the drugs in the suitcase and put the drugs -- the suitcase in

8    the back, in the trunk.  On some occasions I went without

9    carrying any luggage, so I would prepare a bag or something.

10   Q.    Would you pay Coquito for the drugs when you picked them

11   up?

12   A.    No.

13   Q.    What was Coquito's price for the drugs, if ultimately they

14   had to be paid for?

15   A.    The price changed, but between 60 to 64.

16   Q.    Thousand?

17   A.    Yes.

18   Q.    And what were you going to attempt to sell them to

19   Mr. Martinez for?

20   A.    Well, if I got them at 60, I would try at least to get 65,

21   64.  If I got them for 64, I would try 67, 68.

22   Q.    Okay.  So, you were hoping to make a

23   several-thousand-dollar profit on each kilo?

24   A.    That is correct.

25   Q.    And you said that you were only successful in having

1    Mr. Martinez buy the kilo one time?

2    A.    That is correct.

3    Q.    Was that towards the beginning of your trying or towards

4    the end?

5    A.    The beginning.

6    Q.    So, you've told us you tried this several times, so there

7    was a lot of failure.  Why did you understand that you were

8    failing in being able to sell this fentanyl to Mr. Martinez?

9    A.    Well, according to him, because of the quality.

10   Q.    And when he would tell you that the quality was no good,

11   what would happen to the kilos that you had attempted to sell

12   him?

13   A.    I would call the owner, tell him what was happening, so he

14   would get them to pick them up.  On some occasions he didn't

15   have anyone to come and pick them up, so I had to take them

16   with me and take them back.

17   Q.    Okay.  And did you ever find any other buyers instead of

18   returning them?

19   A.    Yes.

20   Q.    So, I want to turn now to a few telephone calls that are

21   related to this aspect of your work.  So, turning to

22   Government's Exhibit 1201, Mr. Amparo, when we met in my office

23   to discuss your testimony, did we go over a series of recorded

24   telephone calls?

25   A.    Yes.

1   Q.   And were those played for you in Spanish?

2   A.   Yes.

3   Q.   And among the questions I asked about those calls did I

4   ask you to confirm that the speakers on the transcripts were

5   identified correctly?

6   A.   Yes.

7   Q.   Looking at this transcript, do you recall listening to

8   this call?

9   A.   Do I have to read it?

10  Q.   You just have to look at it enough to recognize it as a

11  call you listened to.

12  A.   Yes.

13  Q.   And when we listened to that did you confirm for me that

14  the speakers were identified correctly?

15  A.   Yes.

16  Q.   Okay.  And this call has a date and time of February 7th,

17  2018 at 10:18 at night?

18  A.   Yes.

19  (FOLLOWING IS A READING OF THE TRANSCRIPT AS READ BY ATTORNEY

20  AFRAME AND ATTORNEY KONESKY):

21          MS. KONESKY:  What's the news.

22          MR. AFRAME:  Chillin.  I was checking this here.  Is

23  this the white one, man?

24          MS. KONESKY:  Yes, of course.

25          MR. AFRAME:  It looks like --

1          MS. KONESKY:  So, this one is more --

2          MR. AFRAME:  Color.

3          MS. KONESKY:  Whiter than Bill Clinton, as they say.

4          MR. AFRAME:  Who said?  But this is yellow.

5          MS. KONESKY:  No, man.

6          MR. AFRAME:  No, but I have it on my hand, Mister,

7    here, right now.  Are you the one who did the little hole?

8          MS. KONESKY:  Yes, it was me who did it, of course.

9          MR. AFRAME:  Well, that is yellow.

10          MS. KONESKY:  Hmm.

11          MR. AFRAME:  Well, that is like an ash color.  No,

12    because he called me like three days ago or two, told me the

13    same thing, like, like --

14          MS. KONESKY:  Uh, uh, uh.

15          MR. AFRAME:  People down there so that --

16          MS. KONESKY:  As far as I know, that guy does not,

17    does not know those people.  In fact, I know those people,

18    because they are guys that we grew up together in the --

19          MR. AFRAME:  I see.

20          MS. KONESKY:  -- same neighborhood, and they are over

21    there at Vicente's (ph) and stuff.

22          MR. AFRAME:  Mm-hmm.

23          MS. KONESKY:  So --

24          MR. AFRAME:  Yes, but --

25          MS. KONESKY:  Tell me.  So, that arrived and it stuck

1    because he has to be given money, you know?  It was at dawn

2    today that he wanted me to go get that from him.

3            MR. AFRAME:  Yes, Mister.  This -- this is of the

4    other thing, right?

5            MS. KONESKY:  Mm, of the, of the yellow?

6            MR. AFRAME:  This smells like chicken shit.

7            MS. KONESKY:  Mm.

8            MR. AFRAME:  The color says it all.  The color, the

9    color says it all.  This is yellow, yellow.

10           MS. KONESKY:  Uh --

11           MR. AFRAME:  It's like soil, and this is, this is one

12   of the other things, it smells like that, too.  This one, this

13   one is of the black one.  This one is the black one.

14           MS. KONESKY:  The black one, but the black one is not

15   that same one.  I mean, it is not, it's not from the same line.

16           MR. AFRAME:  Look, no, this one is -- it is -- it is

17   like the one I gave you once, remember?

18           MS. KONESKY:  Mm-hmm.

19           MR. AFRAME:  And it was returned that time.

20           MS. KONESKY:  Mm-hmm.

21           MR. AFRAME:  And it was the same.

22           MS. KONESKY:  Damn.  You think that is the same thing,

23   man?  But to me --

24           MR. AFRAME:  Of course.  I put it on my tongue just

25   now.  That stinks like chicken shit.

1           MS. KONESKY:  They gave it to me as that one.

2           MR. AFRAME:  Because it's that -- this is of the

3      other, because it's yellow.  This is yellow.

4           MS. KONESKY:  I see.

5           MR. AFRAME:  Mm-hmm.

6           MS. KONESKY:  I saw it.  It has a color like beige.

7      Look at it.

8           MR. AFRAME:  Like beige?  This is beige?  No beige.

9      It's a bit -- a bit beige but not this one.  This is like, like

10     sand from the beach.

11          MS. KONESKY:  Damn.

12          MR. AFRAME:  Sand from the beach.

13          MS. KONESKY:  But anyway, Mister -- so with regards to

14     the other thing, he says there are -- but he has to be given

15     four.  Four times four is 16.

16          MR. AFRAME:  Mm-hmm.

17          MS. KONESKY:  I don't know if you want to get into

18     that.  I gave it to you where you -- with a couple of -- a

19     couple of pesos that you let me make for each one.  I'm happy

20     to --

21          MR. AFRAME:  How much did he have it for?

22          MS. KONESKY:  No, he has not given me a price.  He

23     told me, When you get the money, if you get it, you call me.

24          MR. AFRAME:  But what is it to take it down?

25          MS. KONESKY:  Say again?

1          MR. AFRAME:  What is it that he has, four children?

2          MS. KONESKY:  Four children, yes.  He actually has

3     eight, but they are -- uh -- there are -- there are -- there

4     are, sorry, seven, but there are three of the other ones that

5     are not of that line, but of the one you say that one is, and I

6     know you don't get your hand in that, so what I --

7          MR. AFRAME:  No, I don't fuck with that.

8          MS. KONESKY:  I -- if you know someone too, what I --

9     I'm going to talk to him, is to grab that and -- and that's it.

10    If anything, if you want --

11         MR. AFRAME:  Mm-hmm.

12         MS. KONESKY:  If anything, you yourself can go down

13    with me and send your people so you see that it is not, it is

14    not any --

15         MR. AFRAME:  No, no, no, no, no.  Don't need to even

16    do it as if we had to go see.  He wants to make sure that you

17    assure me that you have worked well.  That's it.  That's it

18    not.  You understand?

19         MS. KONESKY:  No, no, because, listen, what we can do,

20    what I had in mind, because you know that not all the stuff

21    passes, not everything is good --

22         MR. AFRAME:  Mm-hmm.

23         MS. KONESKY:  -- I will speak with him.  That is why I

24    wanted to meet with him, for me to call him right there in

25    front of you and tell him that, in case that does not pass for

1    what it is, that I was going to keep that until the 16 bucks

2    show up.

3                    (End of reading of the transcript)

4    BY MR. AFRAME:

5    Q.   Mr. Amparo, can you describe for us generally what you're

6    talking about here with Mr. Martinez?

7    A.   It was first regarding this drug I brought him that he did

8    not like, because it was yellow, and he did not like that

9    color.  He wanted it white.  And the second was regarding 4

10   kilos.

11   Q.   Okay.  Tell me about the 4 kilos.  I'm sorry.

12   A.   That was a drug that arrived from Mexico.  So, they had 4

13   kilos for me to bring over, but in order to receive them I had

14   to give 4,000 for each one, and so -- well, what I wanted was

15   for him to at least to put the 16,000 bucks so he would keep

16   the drugs if he liked them, and/or at least if he didn't want

17   to, that he would come with me to New York or that he would

18   send with me someone that he trusted in so they could confirm.

19   Q.   And did he want to do that?

20   A.   It's the only --

21   Q.   Did he want to go with you to New York?

22   A.   I don't think so, no.

23   Q.   At line 56 Mr. Martinez says, "What is it that he has,

24   four children?"  In that sentence what did you understand

25   "children" to be talking about?

1    A.    Four kilos.

2    Q.    And in line 63 you say, "Not all the stuff passes, not

3    everything is good."  What does that mean, not all the stuff

4    passes?

5    A.    That not all the drug is good.

6    Q.    Okay.

7            THE COURT:  How much more direct do you have?

8            MR. AFRAME:  So, I have several more calls.  I'm about

9    to start another one.

10           THE COURT:  No.  We should stop.  I have to get on a

11   conference call.  So, we will reconvene at 2:00 p.m., and then

12   the usual up to 5:00 p.m.  All right.

13           Anything for the Court?  All right.  See you at 2:00

14   p.m.

15                (Lunch recess taken at 1:00 p.m.)

16                (WHEREUPON, the proceedings adjourned)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     skill and ability, a true and accurate transcription of my

8     stenotype notes taken in the matter of *U.S. v. Martinez*, No.

9     1:18-cr-00033-01-JL.

10

11

12

13

14     Date:  ___10/14/20           */s/ Brenda K. Hancock*
                                    Brenda K. Hancock, RMR, CRR
15                                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25